ACCEPTED
15-25-00033-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/27/2025 6:38 PM
CHRISTOPHER A. PRINE
CLERK

Cause No. 15-25-00033-CV

# IN THE COURT OF APPEALS
# FOR THE FIFTEENTH DISTRICT OF TEXAS AT AUSTIN

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
8/27/2025 6:38:03 PM
CHRISTOPHER A. PRINE
Clerk

**EDITH OMIETIMI**,
*Appellant,*

v.

**TEXAS BOARD OF NURSING**,
*Appellee.*

On Appeal from Cause No. D-1-GN-24-003659 in the 419th
Judicial District Court of Travis County, Texas

## APPELLEE TEXAS BOARD OF NURSING'S BRIEF ON THE MERITS

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney
General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil
Litigation

**ERNEST C. GARCIA**
Chief, Administrative Law
Division

**KATHY JOHNSON**
State Bar No. 24126964
Assistant Attorney General
Administrative Law Division
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4164
Facsimile: (512) 320-0167
Kathy.johnson@oag.texas.gov

ATTORNEYS FOR APPELLEE
TEXAS BOARD OF NURSING

ORAL ARGUMENT NOT REQUESTED

# TABLE OF CONTENTS

Table of Contents ............................................................................ii

Glossary of Technical Terms...........................................................iv

Index of Authorities........................................................................v

Statement of the Case ..................................................................viii

Statement Regarding Oral Argument ............................................ix

Issues Presented...............................................................................x

Statement of Facts ...........................................................................1

    I.     The Board's Investigation Began with a Tip from the FBI's Operation Nightingale. .................................................................1

    II.    The Practical Nursing Program from Sacred Heart Fell Well-Below Texas Standards.......................................................2

    III.   BON Adopted the ALJ's Recommendation to Deny Ms. Omietimi's License Renewal Application to Protect the Public from an Unqualified Nurse................................................4

Summary of the Argument ..............................................................6

Standard of Review ..........................................................................7

Argument.........................................................................................11

    I.     The Trial Court Did Not Err When It Found that BON's Final Order was Supported by Substantial Evidence................11

    II.    The Trial Court Did Not Err When It Found that BON Legally Issued Its Final Order, Despite the Fact that the PFD Cited a Burden of Persuasion. ...........................................14

    III.   The Trial Court Did Not Err When It Found that BON Validly Denied the Renewal of Ms. Omietimi's License. ...........16

IV.    The Trial Court Did Not Err When It Found that BON Did Not Violate Ms. Omietimi's Constitutional Right to Due Process......................................................................18

Conclusion ................................................................................22

Certificate of Compliance...........................................................24

Certificate of Service .................................................................24

Index of Appendices ..................................................................25

iii

# GLOSSARY OF TECHNICAL TERMS

A.R. [Bates #]       Administrative Record

ALJ          Administrative Law Judge

APA          Texas Government Code section 2001, Administrative Procedure Act

App. Br. [page]       Brief of Appellant Omietimi, Filed on May 28, 2025

App. [Letter] at [Page]    Appendix

Board Rules       Texas Board of Nursing's Rules at 22 Texas Administrative Code chapters 211-228

BON          Appellee, Texas Board of Nursing

FBON         Florida Board of Nursing

Final Order       Texas Board of Nursing's Opinion and Order of the Board Issued on April 18, 2024

LVN          Licensed Vocational Nurse

NPA          Nursing Practice Act, Texas Occupations Code Chapter 301

PFD          Proposal for Decision

SOAH         State Office of Administrative Hearings

# INDEX OF AUTHORITIES

## Cases

*Bd. of Law Exam'rs v. Stevens,*
868 S.W.2d 773 (Tex. 1994) ....................................................8, 9

*City of Hutchins v. Prasifka,*
450 S.W.2d 829 (Tex. 1970) ....................................................13

*Hovel v. Batzri,*
490 S.W.3d 132 (Tex. App.—Houston [1st Dist.] 2016, pet.
denied) ..................................................................................10

*Jernigan v. Langley,*
111 S.W.3d 153 (Tex. 2003) ..............................................7, 12

*Mosley v. Tex. Health and Human Services Comm'n,*
593 S.W.3d 250 (Tex. 2019) ...................................................20

*Patel v. Tex. Dep't of Licensing & Regulation,*
469 S.W.3d 69 (Tex. 2015) ............................................. 19, 20

*Scally v. Texas State Bd. of Med. Examr's,*
351 S.W.3d 434 (Tex. App.—Austin, 2011, pet. denied) . 7, 8, 10, 11, 19

*Schwab v. Schlumberger Well Surveying Corp.,*
198 S.W.2d 79 (Tex. 1946) .....................................................10

*Sheffield v. Nobles,*
378 S.W.2d 391 (Tex. App.—Austin, 1964, writ denied)....................10

*State v. Pub. Util. Comm'n,*
883 S.W.2d 190 (Tex. 1994) .................................................7, 9

*Tex. State. Bd. of Med. Exam'rs v. Birenbaum,*
891 S.W.2d 333 (Tex. App.—Austin, 1995, writ denied)......................9

*Tex. State. Bd. of Med. Exam'rs v. Mann,*
413 S.W.2d 382 (Tex. 1967) ..................................................18

*Tourneau Houston, Inc. v. Harris Cty. Appraisal Dist.,*

24 S.W.3d 907 (Tex. App.—Houston [1st Dist.] 2000, no pet.) ...........14

*Van Independent School Dist. V. McCarty,*
165 S.W.3d 351 (Tex. 2005) ...............................................................13

**Statutes**

Tex. Gov't Code § 2001.174 .................................................................8

Tex. Gov't Code § 2001.174 (2)(A) ......................................................8

Tex. Occ. Code Ch. 301.......................................................................7

Tex. Occ. Code § 301.157 ..................................................................20

Tex. Occ. Code § 301.157(d) ...............................................................6

Tex. Occ. Code § 301.301 ..................................................................22

Tex. Occ. Code § 301.301(b)...............................................................17

Tex. Occ. Code § 301.452................................................................6, 22

Tex. Occ. Code § 301.452(b)(1) .........................................................16

Tex. Occ. Code § 301.453..................................................................22

Tex. Occ. Code § 1602.254................................................................19

**Rules**

1 Tex. Admin. Code § 155.427............................................................15

16 Tex. Admin. Code § 83.20.............................................................19

16 Tex. Admin. Code § 83.21.............................................................19

16 Tex. Admin. Code § 83.120...........................................................19

22 Tex. Admin. Code § 211.2(a) ........................................................21

22 Tex. Admin. Code § 213.28(k)(1) ..................................................17

22 Tex. Admin. Code § 213.29...........................................................17

22 Tex. Admin. Code Ch. 214 ...................................................................21

22 Tex. Admin. Code § 214.10(a) (2018) ...................................................3

22 Tex. Admin. Code § 214.10(d) (2018) ...................................................3

22 Tex. Admin. Code § 214.10(f) ...............................................................3

22 Tex. Admin. Code § 216.11 ..................................................................17

22 Tex. Admin. Code § 217.2(a)(4)(B)(ii) (2020) ......................................3

22 Tex. Admin. Code § 217.5(a) ...............................................................21

22 Tex. Admin. Code § 217.5(a)(1)(B) ......................................................21

## Other Authorities

Acts 1981, 67th Leg., 1st C.S., p. 36, Ch. 1, § 6(a), eff. Aug. 5, 1981 .....18

David F. Johnson, *The Use of Presumptions in Summary Judgment Procedure in Texas and Federal Courts*, 54 Baylor L. Rev. 605 (2002) .......................................................................................................15

John A. Townsend, *Burden of Proof in Tax Cases: Valuation and Ranges-an Update*, 73 Tax Law. 389 (2020) ..........................................15

# STATEMENT OF THE CASE

*Nature of the Case*: This is an appeal of a suit for judicial review of the Board of Nursing's April 18, 2024 Final Order, denying the renewal of Ms. Omietimi's LVN license. App. B.

*Proceedings*: SOAH held a hearing on the merits on September 25, 2023. The ALJ issued a PFD on November 20, 2023. App. A. After Ms. Omietimi filed exceptions to the PFD, the ALJ issued a letter declining to modify the PFD. A.R. 4888-4889. BON issued its Final Order on April 18, 2024. App. B. The trial court held a temporary injunction hearing on July 2, 2024 and filed an order denying the temporary injunction on August 2, 2025. C.R. 30. The trial court held a final hearing on the merits on December 19, 2024 and issued its Final Judgment on February 19, 2025. App. D.

*Trial Court Disposition*: The Honorable Judge Maya Gamble, sitting in the 419th District Court of Travis County, Texas, issued the Final Judgment affirming BON's Final Order. App. D.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested because the issues in this case are adequately presented in the briefs. However, if the court grants oral argument, the Board would like an opportunity to present.

## ISSUES PRESENTED

1.  Did the trial court correctly affirm the BON's Final Order when:

    A.  The BON's Final Order denying the renewal of Ms. Omietimi's license was supported by substantial evidence?

    B.  The BON's Final Order was not affected by error of law when the PFD asserted that Ms. Omietimi had not carried her burden of persuasion?

    C.  The BON did not act in excess of its statutory authority or abuse its discretion when its Final Order denied the renewal of Ms. Omietimi's license?

    D.  The BON's Final Order did not violate Ms. Omietimi's due process rights?

## STATEMENT OF FACTS

**I.     The Board's Investigation Began with a Tip from the FBI's Operation Nightingale.**

The FBI's "Operation Nightingale" investigated nursing schools that provided diplomas to nursing students who had not completed a full course of study at an approved nursing school. App. A at 37-38; A.R. 4799-4800. Ms. Omietimi's name was on the FBI's list of identified participants in the Nightingale scheme. After learning about Operation Nightingale, the Texas Board of Nursing (BON) investigated Ms. Omietimi and filed a complaint at SOAH to revoke Ms. Omietimi's license or deny the renewal of her license. A.R. 0001-0005.

Ms. Omietimi had received a Licensed Practical Nurse license from the Florida Board of Nursing (FBON) on February 12, 2021, and she then applied to BON for a Texas LVN license via endorsement. App. A at 36-37. On her endorsement application, Ms. Omietimi represented to BON that she received her practical nursing education from Sacred Heart, located in Deerfield Beach, Florida. A.R. 435. The Florida Commission for Independent Education (FCIE) and FBON had approved Sacred Heart to provide *on-campus* instruction in Florida. A.R. 637 (emphasis added). Sacred Heart was required to provide 1,350 total clock hours,

with 655 hours being composed of clinical instruction. A.R. 637. On March 22, 2021, BON approved Ms. Omietimi's application for endorsement and issued her Licensed Vocational Nurse License Number 1032052. App. A at 37. On April 7, 2023, Ms. Omietimi applied for the renewal of her LVN license. A.R. 448.

BON did not issue a renewal; rather, it referred her case to SOAH based upon the FBI's Operation Nightingale investigation. During the course of BON's investigation, BON learned that Ms. Omietimi had not attended her practical nursing program with Sacred Heart on-campus in Florida. A.R. 4541-42. Instead, she attended the Sacred Heart practical nursing program in person in Houston, Texas from November 2019 to March 2020. A.R. 4640, 4541-42; App. A at 38. Due to the emergence of COVID-19, she completed the rest of her practical nursing program at Sacred Heart online, graduating in October 2020. App. A at 39. BON never approved Sacred Heart to operate in Texas, and Sacred Heart's practical nursing program did not meet Texas requirements for nursing programs. A.R. 4638-47.

## II. The Practical Nursing Program from Sacred Heart Fell Well-Below Texas Standards.

BON regulates Texas-based LVN programs, requiring didactic and clinical instruction. BON requires nursing students to receive rigorous clinical instruction. Students should receive from the program written clinical objectives and measurable outcomes for clinical experiences in preparation for their clinical experiences. A.R. 4643. Faculty must supervise clinical instruction. A.R. 4643, 22 Tex. Admin. Code § 214.10 (a), (d) (2018). Faculty must also evaluate student performance during clinicals. A.R. 4643, 22 Tex. Admin. Code § 214.10(f). Instead, Ms. Omietimi never received written clinical objectives or measurable outcomes. App. A at 42. She did not receive faculty supervised clinical instruction at Sacred Heart in the five subject areas required by BON— medical-surgical nursing, maternal/child health, pediatrics, geriatrics, and mental health nursing. App. A at 41; 22 Tex. Admin. Code § 217.2 (a)(4)(B)(ii) (2020). Moreover, she participated in zero hours of hands-on clinical learning experiences with live patients. A.R. 4554, 4582, 4589. An average Texas approved LVN program provided over 500 hours of clinical instruction to its students during the 2019-2020 academic year. A.R. 4646; *See* A.R. 0700-4443. Ms. Omietimi received no instruction in

biological, physical, social, behavioral and nursing sciences, as required by BON. App. A at 41-42.

Additionally, Sacred Heart failed to comply with several other rules. Specifically, Sacred Heart did not employ enough faculty members to enable its students to meet program goals because Serge Jean was the only instructor at Sacred Heart. App. A at 42. Sacred Heart did not have any required textbooks. App. A at 42. Sacred Heart did not have adequate facilities: its skills lab was ill-equipped, could only accommodate five students at a time, and did not maintain a computer lab or library. App. A at 42.

## III. BON Adopted the ALJ's Recommendation to Deny Ms. Omietimi's License Renewal Application to Protect the Public from an Unqualified Nurse.

A contested case hearing was held on September 25, 2023, before the State Office of Administrative Hearings. The ALJ considered the testimony of three witnesses, and thirty-one exhibits. App. A at 11-12. Ms. Omietimi testified regarding her education at Sacred Heart. App. A at 12-16. Agent Lane, an FBI agent, testified about Operation Nightingale. App. A at 17-18. Finally Dr. Lisa Donnelly, an expert in nursing education, testified that 1) Sacred Heart operated a LVN

program without approval; 2) Sacred Heart did not maintain sufficient faculty to meet the needs of the program; 3) Sacred Heart provided an inadequate curriculum and deficient clinical learning experiences; 4) Sacred Heart did not complete required pretesting; 5) Sacred Heart did not follow sound educational practices, and 6) Sacred Heart lacked adequate facilities. App. A at 19-27; A.R. 4640-46, 4707-11.

After the close of the evidence, the ALJ issued a PFD on November 20, 2023, concluding that Ms. Omietimi did not successfully complete an approved LVN program, nor did she receive a substantially equivalent education. App. A at 44. The ALJ ultimately recommended that BON deny the renewal of Ms. Omietimi's LVN license. App. A at 44.

BON adopted the ALJ's findings of fact and conclusions of law in its Final Order issued on April 18, 2024. App. B at 1. In its Final Order, BON reiterated the ALJ's determination that Ms. Omietimi received an unlawfully issued diploma and never received an education substantially equivalent to a Texas approved LVN program. App. B at 2. Ms. Omietimi's inadequate nursing education will continue to pose a risk to public safety while she practices as a nurse. App. B at 3. Therefore, BON denied the renewal of Ms. Omietimi's LVN license. App. B at 3.

After the issuance of BON's Final Order, Ms. Omietimi timely filed a motion for rehearing. App. C. After the motion for rehearing was overruled by operation of law, Ms. Omietimi filed a suit for judicial review and a request for a temporary injunction. *Pl.'s Pet. & Request for TI.* A temporary injunction hearing took place on July 2, 2024. The district court filed its order denying Ms. Omietimi's temporary injunction request on August 2, 2024. C.R. 30. On December 19, 2024, counsel for both parties appeared before the district court and argued in favor of their positions in a hearing on the merits. The district court issued its Final Judgment on February 19, 2025, affirming BON's Final Order. App. D.

## SUMMARY OF THE ARGUMENT

The trial court correctly concluded substantial evidence supports BON's Final Order, and the order is not affected by an error in law. Nursing expert, Dr. Lisa Donnelly, testified that Ms. Omietimi did not receive an adequate education from an approved school. A.R. 4640-4646. Because nurses must attend approved schools to be licensed, BON validly denied the renewal of Ms. Omietimi's LVN license. *See* Tex. Occ. Code §§ 301.157(d), 301.452. BON never waived its right to deny the renewal of her license. *See Jernigan v. Langley,* 111 S.W.3d 153, 156 (Tex. 2003)

(citations omitted). Additionally, the fact that the PFD underlying BON's Final Order cites a burden of persuasion does not invalidate the order. *See State v. Pub. Util. Comm'n*, 883 S.W.2d 190, 204 (Tex. 1994); 1 Tex. Admin. Code § 155.427; BON issued its Final Order in accordance with its statutory authority under section 351.452 of the NPA. BON lawfully exercised its discretion in denying the renewal of Ms. Omietimi's license because license renewal is not a ministerial duty. *See* Tex. Occ. Code §§ 301.301(b), .452(b). Finally, BON provided Ms. Omietimi with due process in the form of notice, a hearing, and the ability to appeal its decision. *See* A.R. 11-18, 385-396, 501-503; App. A; C.R. 24-26. BON's interest in protecting the public health far outweighs Ms. Omietimi's interest in maintaining her license when she received an inadequate education. For these reasons, the trial court's Final Judgment should be affirmed.

## STANDARD OF REVIEW

The focus of the substantial evidence review is BON's Final Order. *Scally v. Texas State Board of Med. Exam'rs,* 351 S.W.3d 434, 441 (Tex. App.—Austin, 2011) (pet. denied); *see* Tex. Occ. Code Ch. 301. Under the substantial evidence standard of review, a court may affirm an agency

decision in whole or in part. Tex. Gov't Code § 2001.174. The APA provides six grounds for reversing or remanding an agency decision for further proceedings:

> [I]f substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (A) in violation of a constitutional or statutory provision;
> (B) in excess of the agency's statutory authority;
> (C) made through unlawful procedure;
> (D) affected by other error of law;
> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174 (2)(A). In reviewing BON's Final Order, it is presumed that the order is supported by substantial evidence, and the Appellant bears the burden to prove otherwise. *Scally,* 351 S.W.3d at 441.

When applying the substantial evidence standard of review to the agency's decision, the reviewing court is prohibited from substituting its own judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion. *Bd. of Law Exam'rs v. Stevens*, 868 S.W.2d 773, 778 (Tex. 1994). The test for review of an agency action is not whether the agency reached the correct conclusion, but whether

some reasonable basis for the agency's action exists in the record. *State v. Pub. Util. Comm'n*, 883 S.W.2d 190, 204 (Tex. 1994). Texas courts have stated that although substantial evidence is more than a mere scintilla, the evidence may actually preponderate against the agency decision and yet still amount to substantial evidence supporting the result reached by the agency. *Id.* at 204. If reasonable minds could have reached the conclusion that BON reached on the record presented, then a court undertaking review should uphold the BON Final Order. *Stevens*, 868 S.W.2d at 778; *Tex. State. Bd. of Med. Exam'rs v. Birenbaum,* 891 S.W.2d 333, 337 (Tex. App.—Austin, 1995, writ denied).

The Court need not look beyond the substantial evidence rule and rely on *Loper-Bright* to decide this case. BON does not argue that the NPA is ambiguous or that the Court should defer to BON's interpretation of the NPA. Instead, BON argues that, based on the clear language of the statute, BON validly issued its Final Order denying the renewal of Ms. Omietimi's license.

Additionally, the Court should not interpret the denial of Ms. Omietimi's LVN license-renewal as a penal statute. *Schwab* and *Sheffield*, cited by Ms. Omietimi for the proposition that administrative

actions regarding licensure operate as penal statutes, focus on whether a business owner may incur personal liability under sections of the tax code.[1] These cases are distinct from the present case because corporations typically shield their officers and directors from liability, so a statutory shift to personal liability may be interpreted as a penal statute. *See Schwab v. Schlumberger Well Surveying Corp.,* 198 S.W.2d 79 (Tex. 1946); *Hovel v. Batzri,* 490 S.W.3d 132 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). In this case Ms. Omietimi applied for her own license and was issued a license in her own name, meaning that she would personally incur liability.

In *Scally*, the Court noted that contested-case hearings in Texas Medical Board cases are not quasi-criminal proceedings. *See Scally v. Texas State Bd. of Med. Examr's*, 351 S.W.3d 434, 447 (Tex. App.—Austin, 2011, pet. denied). BON's contested case hearings should similarly be considered non-quasi-criminal in nature. By the same token, BON's licensing actions should not be considered penal if the hearing itself is not quasi-criminal in nature. The Court should review this case

---

[1] *Schwab v. Schlumberger Well Surveying Corp.,* 198 S.W.2d 79, 82 (Tex. 1946) (The Court held that Petitioners, officers, and directors of a corporation, were not personally liable under the tax code); *Sheffield v. Nobles,* 378 S.W.2d 391 (Tex. App.—Austin, 1964, writ denied) (The Court held that the partner was liable for the corporation's debt under the tax code.).

under the substantial evidence rule.

## ARGUMENT

**I.   The Trial Court Did Not Err When It Found that BON's Final Order was Supported by Substantial Evidence.**

It is presumed that BON's Final Order is supported by substantial evidence, and it is Ms. Omietimi's burden to prove otherwise. *Scally,* 351 S.W.3d at 441. She has not carried this burden. After issuing a license to Ms. Omietimi, BON retained its right to deny the renewal of her license based on her lack of an adequate education. Dr. Lisa Donnelly testified at the SOAH hearing that Ms. Omietimi attended Sacred Heart—a nursing program that 1) operated a LVN program without approval; 2) did not maintain sufficient faculty to meet the needs of the program; 3) provided inadequate curriculum and deficient clinical learning experiences; 4) did not complete pretesting; 5) did not follow sound educational principles; and 6) lacked adequate facilities. A.R. 4640-4646. The ALJ ultimately affirmed the expert's conclusions. *See* App. A. at 36-42. "The ALJ, as factfinder, determines the credibility of witnesses and the weight of their testimony." *Scally,* 351 S.W.3d at 441.

Despite having previously issued to Ms. Omietimi an LVN license, BON issued its Final Order based on substantial evidence that Ms.

Omietimi had not received an adequate education. When BON originally issued a license to Ms. Omietimi in March 2021, her application, on its face, met the requirements for licensure, and therefore, BON issued her a license. A.R. 426-439. Ms. Omietimi argues that the issuance of the license indicates that BON considered Ms. Omietimi's nursing education to be substantially equivalent. App. Brief at 20. However, when BON received new information from the FBI, BON's investigation determined that Ms. Omietimi never received an education substantially equivalent to a nursing school approved by Texas Board of Nursing *See* A.R. 4646, 0700-4443. Agencies must be able to base their decisions on current information as it comes to light, instead of being forced to base their future decisions on information the agency knows is old and incomplete.

In the alternative, Ms. Omietimi argues that BON waived its right to "complain about the alleged quality of the underlying diploma." App. Br. at 22. Waiver revolves around intent, requiring "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley,* 111 S.W.3d 153, 156 (Tex. 2003) (citations omitted). Conduct establishing waiver "must be unequivocally inconsistent with claiming a known right." *Van*

*Independent School Dist. V. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005). There are no such facts here.

BON issued Ms. Omietimi a license on March 22, 2021, based on Ms. Omietimi's *representation* that she attended Sacred Heart in Florida and that she received the LVN education FBON approved Sacred Heart to provide. A.R. 435; App. A at 37. Once BON learned of Ms. Omietimi's educational deficiencies from the FBI, BON investigated Ms. Omietimi and instituted proceedings at SOAH. A.R. 0001-0005. These actions demonstrate that BON diligently sought to deny the renewal of Ms. Omietimi's license once BON learned that Ms. Omietimi received neither a lawfully issued diploma nor an education substantially equivalent to a Texas approved LVN program. Such conduct by BON does not comport with an intentional relinquishment of its right to revoke or deny renewal of Ms. Omietimi's license.

To the extent that the Court may view Ms. Omietimi's waiver argument as an estoppel argument, estoppel does not prevent BON from denying the renewal of Ms. Omietimi's license. Generally, governmental entities are not subject to the doctrine of estoppel. *City of Hutchins v. Prasifka,* 450 S.W.2d 829, 835 (Tex. 1970). Specifically, estoppel does not

apply against state agencies. *Tourneau Houston, Inc. v. Harris Cty. Appraisal Dist.,* 24 S.W.3d 907, 910 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Therefore, estoppel does not prevent BON from denying the renewal of Ms. Omieitimi's LVN license.

## II. The Trial Court Did Not Err When It Found that BON Legally Issued Its Final Order, Despite the Fact that the PFD Cited a Burden of Persuasion.

Ms. Omietimi argues that BON's Final Order cannot stand because it is premised upon the PFD issued in this case, which discusses Omietimi having the burden of persuasion. In Conclusion of Law 5, the ALJ found that "[BON] had the burden of identifying the legal standards alleged to apply and to produce evidence that they were not met, and [Ms. Omietimi] had the ultimate burden of persuasion to show her qualifications for the privilege of continuing nursing practice in this state." App. A at 43 (citations omitted). However, the ALJ did not err and the BON's Final Order does not contain error because the BON maintained the burden of *proof* throughout the trial.

The burden of proof consists of two components—the burden of production and the burden of persuasion. The burden of production requires a party to produce sufficient evidence to make out a prima facie

case. The burden of persuasion requires a party to convince the trier of fact that a fact is more likely true than not. David F. Johnson, <u>The Use of Presumptions in Summary Judgment Procedure in Texas and Federal Courts</u>, 54 Baylor L. Rev. 605, 608-09 (2002); John A. Townsend, <u>Burden of Proof in Tax Cases: Valuation and Ranges-an Update</u>, 73 Tax Law. 389, 398-403 (2020).

Under SOAH's rules, the ALJ must determine the burden of proof by considering "the applicable statute, the referring agency's rules, and the referring agency's policy […]" 1 Tex. Admin. Code § 155.427. While determining the burden of proof, the ALJ may also consider: "1) the status of the parties; 2) the parties' relative access to and control over information pertinent to the merits of the case; 3) the party seeking affirmative relief; 4) the party seeking to change the status quo; and 5) whether a party would be required to prove a negative." *Id.*

Because BON would have been required to prove a negative if required to prove that Ms. Omietimi did not meet nursing standards when she did not qualify to be a nurse, the ALJ reasonably assigned this burden of persuasion to Ms. Omietimi. Furthermore, BON carried its burden to demonstrate that Ms. Omietimi did not qualify to practice as a

nurse in Texas. *See* A.R. 4646, 0700-4443, 4554, 4582, 4589, 4643. BON's Final Order was not rendered infirm with an error of law nor rendered as arbitrary and capricious due to the PFD's assignment of burdens.

## III. The Trial Court Did Not Err When It Found that BON Validly Denied the Renewal of Ms. Omietimi's License.

Contrary to Ms. Omietimi's argument, BON has the authority to deny the renewal of her LVN license. BON followed its legislative mandate to protect the public health by preventing an unqualified nurse from practicing. The NPA authorizes BON to deny a license renewal under Sections 301.452 and 301.453. A nurse is subject to "denial of a license or to disciplinary action under [Subchapter J] for a violation of [the NPA, or] a rule or regulation" issued under the authority of the Nursing Practice Act. Tex. Occ. Code § 301.452(b)(1). Therefore, a nurse's violation of the NPA or Board Rules gives BON the authority to either discipline the nurse or subject the nurse to denial of a license.

Even though the PFD did not explicitly cite a violation of Section 301.452(b), the PFD's Findings of Facts and Conclusions of Law demonstrate that Ms. Omietimi violated the NPA. The ALJ concluded that Ms. Omietimi had "not successfully complete[d] an approved program of vocational nursing" under Texas Occupations Code section

301.157(d). App. A, COL 14.

BON did not abuse its discretion by denying the renewal of Ms. Omietimi's LVN license. While Ms. Omietimi has argued that renewing a license is a ministerial duty, it is actually discretionary. A LVN "may renew an unexpired license issued under [the NPA] on payment to [BON] of the required renewal fee before the expiration date of the license *and compliance with any other renewal requirements adopted by [BON].*" Tex. Occ. Code § 301.301(b) (emphasis added). This mandate gives BON discretion to institute renewal requirements other than the payment of the renewal fee.

BON has used its discretion to promulgate rules regarding license renewal. *See* 22 Tex. Admin. Code § 216.11 (requiring renewal denial if a nurse does not comply with the continuing competency requirements); 22 Tex. Admin. Code § 213.28 (k)(1) (requiring renewal denial if a nurse has a final conviction or has entered a plea of nolo contendere for certain criminal offenses); 22 Tex. Admin. Code § 213.29 (authorizing the denial of license renewal if the nurse is found to no longer be fit to practice).

*Mann,* relied upon by Ms. Omietimi, is inapplicable in this case. The cited statute in *Mann* has been repealed, and, even if it had not been

repealed, BON has a different enabling statute than the one at issue in *Mann*. Acts 1981, 67th Leg., 1st C.S., p. 36, Ch. 1, § 6(a), eff. Aug. 5, 1981. The governing articles examined in *Mann* provided that "the board *shall* issue an annual registration receipt upon payment of annual dues." *Tex. State. Bd. of Med. Exam'rs v. Mann,* 413 S.W.2d 382, 385 (Tex. 1967). No parallel exists in the NPA.

Therefore, renewing a LVN license is discretionary rather than ministerial. Validly using its discretion, BON denied Ms. Omietimi's LVN license renewal. By denying Ms. Omietimi's LVN license renewal, BON upheld its mission to protect the public health by preventing an inadequately trained nurse from practicing.

## IV. The Trial Court Did Not Err When It Found that BON Did Not Violate Ms. Omietimi's Constitutional Right to Due Process.

BON provided Ms. Omietimi with due process in this case when BON gave her notice, a hearing, and the right to appeal. *See* A.R. 11-18, 385-396, 501-503; App. A; C.R. 24-26. Ms. Omietimi argues that the denial of her license renewal so oppressively burdens her that it is a violation of due course of law under *Patel* and *Mosley*. But Ms. Omietimi cannot prevail on a substantive due process claim because she cannot

prove that a section of the NPA is oppressively burdensome as applied to her in light of BON's interest to protect the public health. *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 87 (Tex. 2015). Ms. Omietimi's burden to prevail on an as-applied challenge is high because the NPA and Board Rules are presumed to be constitutional. *See Id. at* 87.

The Texas Constitution guarantees due course of law to a citizen before depriving a citizen of a property right. Tex. Const. Art. I, § 19. When reviewing a due course of law claim, the Court must determine if a property or liberty right is at issue, and if so, how much process is due. *Scally*, 351 S.W.3d at 446. While a nursing license is a property right, the State may still impose conditions relating to the granting and revocation or denial of a nursing license to protect the public health. *See Id. at* 446.

In *Patel*, the Court held that the statutory provisions and related rules[2] requiring eyebrow threaders to undergo 750 hours of training to obtain a license violated due process. *Patel*, 469 S.W.3d at 91. The threaders met their high burden of proving that the statute and rules were oppressively burdensome as applied to them, in light of the State's

---

[2] Tex. Occ. Code § 1602.254; 16 Tex. Admin. Code §§ 83.120, .20, .21

interest, because nearly half of the required training hours required training on subjects unrelated to threading. *Id. at* 90.

In *Mosley*, the Court held that HHSC violated Mosley's right to due process because it misrepresented the steps that she needed to take to successfully appeal her case. *Mosley v. Tex. Health and Human Services Comm'n*, 593 S.W.3d 250, 254 (Tex. 2019). When advising Mosley on her appellant rights, HHSC did not inform her about the APA's motion for rehearing requirement. *Id.* at 256. After Mosley appealed without filing a motion for rehearing, HHSC argued that the trial court did not have jurisdiction. *Id.* Because the Court found that HHSC's misrepresentation unfairly prejudiced Mosley, the Court remanded the case to HHSC to allow Mosley to file a motion for rehearing. *Id.* at 266-268.

Ms. Omietimi's license renewal denial is distinct from the circumstances in *Patel* and *Mosley*. Unlike *Patel*, in this case the State's interest outweighs Ms. Omietimi's interest to keep practicing as a nurse. The NPA directs BON to only license individuals with a degree from an approved nursing school. Tex. Occ. Code § 301.157. In accordance with its statutory duty, BON has also promulgated detailed rules requiring nursing students to undergo rigorous education and training. *See* 22 Tex.

Admin. Code §§ 211.2(a), 214, 217.5(a)(1)(B); A.R. 4639. Unlike *Patel*, the regulations governing nursing schools are directly related to the safety of future nursing practice. Due to her inadequate education, Ms. Omietimi poses a risk to the public safety while she continues to practice. App. B at 3; A.R. 4647. Though Ms. Omietimi's burden of having her LVN license renewal denied is high, the State's interest in protecting the public health by only allowing sufficiently trained nurses to practice nursing is higher.

Ms. Omietimi argues that she could cure the issue that she attended a program not deemed to be substantially equivalent to a BON approved nursing school by providing evidence of clinical practice. She argues this based on the fact that she believes her education is close enough to a clinical competency program. App. Br. at 40. However, the clinical competency program exception under Rule 217.5(a) is premised upon the fact that the nurse attended an approved school. *See* 22 Tex. Admin. Code § 217.5(a). Because Ms. Omietimi did not receive an approved education, BON need not consider applying the clinical competency exception.

*Mosley* is also distinguishable because Ms. Omietimi does not make a procedural due process claim. *See Pl.'s Brief at* 30-36; App. A at 43, COL

3; App. C. Nor does Ms. Omietimi rely upon a legal misrepresentation from BON. In granting Ms. Omietimi a LVN license, BON made no representation regarding the renewal of her license. BON may deny the renewal of a license under the NPA. Tex. Occ. Code §§ 301.301, .452, .453.

Finally, public policy supports denying the renewal of Ms. Omietimi's LVN license to prevent an inadequately trained nurse from caring for patients. BON's interest in carrying out its mission to protect the public safety by preventing unqualified nurses from practicing far outweighs her interest in keeping her license. Denying the renewal of a professional license is always burdensome to the professional, but that alone does not allow the professional to prevail on an as-applied due process claim.

## CONCLUSION

Appellee BON respectfully asks the Court to affirm the district court's Final Judgment in all respects. BON further requests such other and further relief as the Court may deem just.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney
General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil
Litigation

**ERNEST C. GARCIA**
Chief, Administrative Law Division

*/s/ Kathy Johnson*
**KATHY JOHNSON**
Assistant Attorney General
Texas State Bar No. 24126964
Office of the Attorney General
Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4164
Facsimile: (512) 320-0167
kathy.johnson@oag.texas.gov

ATTORNEY FOR APPELLEE
TEXAS BOARD OF NURSING

# CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i) and relying on the word count function in the word processing software used to produce this document, I certify that the number of words in this document is 4,454, excluding those portions exempted by Rule 9.4(i)(1).

/s/ Kathy Johnson
**KATHY JOHNSON**
ASSISTANT ATTORNEY GENERAL

# CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2025, a true and correct copy of the above and forgoing document was sent to the following attorney in charge via electronic service and/or electronic mail:

Marc Meyer
SBN: 24070266
Law Office of Marc Meyer, PLLC
2300 Woodforest Blvd N, Suite
600
Montgomery, Texas 77316
Telephone: (281) 259-7575

ATTORNEY FOR APPELLANT
EDITH OMIETIMI

/s/ Kathy Johnson
**KATHY JOHNSON**
ASSISTANT ATTORNEY GENERAL

## INDEX OF APPENDICES

PFD ............................................................................................ A

BON Final Order ......................................................................... B

Motion for Rehearing ................................................................. C

Trial Court's Final Judgment ...................................................... D

# Appendix A

# State Office of Administrative Hearings

Kristofer S. Monson
Chief Administrative Law Judge

November 20, 2023

John Vanderford, Texas Board of Nursing          **VIA EFILE TEXAS**

Edith Okechukwu Omietimi
c/o John Shepperd & Lina Al-Salim          **VIA EFILE TEXAS**

     **RE:   Docket Number 507-23-18180**
           *Texas Board of Nursing v. Edith Okechukwu Omietimi*

Dear Parties:

    Please find attached a Proposal for Decision in this case.

    Exceptions and replies may be filed by any party in accordance with 1 Texas Administrative Code section 155.507(b), a State Office of Administrative Hearings rule which may be found at www.soah.texas.gov.

CC:  Service List

# BEFORE THE STATE OFFICE OF ADMINISTRATIVE HEARINGS

---

## TEXAS BOARD OF NURSING,
### PETITIONER
### v.
## EDITH OKECHUKWU OMIETIMI,
### RESPONDENT

---

## TABLE OF CONTENTS

I. Notice, Jurisdiction, and Procedural History ................................................2

II. Background Facts and Overview of Issues .....................................................2

III. Applicable Law ..............................................................................................6

    A. Burden of Proof.......................................................................................6

    B. Substantive Law Applicable to Disciplinary Actions ...........................8

    C. Substantive Law Applicable to License Eligibility ..............................9

        1. "Approved" Nursing Programs..................................................9

        2. Substantially Equivalent Education.........................................10

IV.  Evidence ............................................................................................. 11

    A.  Respondent's Testimony .................................................................. 12

    B.  Agent Lane's Testimony .................................................................. 17

    C.  Dr. Donnelly's Testimony ................................................................ 19

        1.  SHH's curriculum deficiencies ................................................ 20

        2.  SHH's faculty deficiencies ...................................................... 22

        3.  Shortcomings of SHH's facilities ........................................... 23

        4.  Inadequacy of SHH's clinical component ............................... 24

V.  Analysis ............................................................................................... 27

    A.  Respondent Did Not Commit Fraud or Deceit in Obtaining the License .......................................................................................... 27

    B.  SHH/Sacred Heart Was Not Approved by the Board ....................... 31

    C.  SHH Did Not Provide a Substantially Equivalent Education to a Board-Approved Program ................................................................ 34

    D.  Recommendation ............................................................................ 35

VI.  Findings of Fact ................................................................................... 36

VII.  Conclusions of Law .............................................................................. 42

VIII.  Recommendation .................................................................................. 44

# BEFORE THE
# STATE OFFICE OF ADMINISTRATIVE HEARINGS

---

### TEXAS BOARD OF NURSING,
#### PETITIONER
#### v.
### EDITH OKECHUKWU OMIETIMI,
#### RESPONDENT

---

## PROPOSAL FOR DECISION

This case involves both a disciplinary action and a license eligibility determination. The Texas Board of Nursing (Board) issued a Licensed Vocational Nurse (LVN) credential (License) to Edith Okechukwu Omietimi (Respondent) in March 2021. In April 2023, Respondent applied to renew the License (Renewal). The staff (Staff) of the Board seeks to revoke the License and deny the Renewal. The Administrative Law Judge (ALJ) finds Staff failed to demonstrate fraud on Respondent's part to prove its basis for License revocation as a disciplinary action. However, the ALJ recommends the Board uphold Staff's decision to deny the Renewal because Respondent does not meet all licensure requirements.

## I. NOTICE, JURISDICTION, AND PROCEDURAL HISTORY

Matters of notice and jurisdiction were undisputed and are set out in the Findings of Fact and Conclusions of Law. On September 25, 2023, State Office of Administrative Hearings (SOAH) ALJ Pratibha J. Shenoy convened the hearing on the merits via Zoom videoconference. Deputy General Counsel John Vanderford represented Staff. Respondent appeared and was represented by attorneys John Shepperd and Lina Al-Salim. The record closed the next day, upon the filing of admitted exhibits.

## II. BACKGROUND FACTS AND OVERVIEW OF ISSUES

In January 2023, the Federal Bureau of Investigation (FBI) and the federal Health and Human Services Commission-Office of Inspector General (HHSC-OIG) announced "Operation Nightingale," a law enforcement action against a fraudulent nursing diploma scheme. Around 7,600 individuals nationwide were identified as participants in a scheme to obtain fraudulent degrees that allowed them to sit for the National Council Licensing Examination (NCLEX) and, if they passed the NCLEX, to obtain licenses to practice nursing.[1] Along with at least 100 other Texas nurses, Respondent was identified as potentially involved in Operation Nightingale.[2]

The Operation Nightingale scheme overlapped with COVID-19 emergency declarations that changed requirements for clinical nursing education. In Texas,

---

[1] *See* https://www.justice.gov/usao-sdfl/pr/fraudulent-nursing-diploma-scheme-leads-federal-charges-against-25-defendants (last visited September 29, 2023).

[2] Respondent does not dispute her name came up in the FBI/HHSC-OIG investigation but denies any wrongdoing.

Governor Abbott issued a disaster declaration on March 21, 2020, allowing the Board to modify certain rules. Relevant to this case, the declaration noted that Board rules limit clinical learning to no more than 50 percent simulation activities, but that requirement would be modified to allow "students in their final year of a nursing education program to meet clinical learning objectives by exceeding the 50% limit on simulated…experiences."[3] The change was meant to "help senior nursing students enrolled in a program that has ceased direct care clinical learning experiences to graduate as planned and become a part of the nursing workforce during this unprecedented disaster when employers need 'all hands on deck.'"[4] The waiver expired September 1, 2022.[5]

In Florida, where the nursing schools involved in Operation Nightingale were based, the State Surgeon General issued an Emergency Order on March 21, 2020, suspending requirements for didactic and clinical programs.[6] The Emergency Order stated that programs may, "with the approval of the dean/program director/program chair/program coordinator, substitute supervised remote live videoconferencing for didactic hours and simulation for all supervised clinical instruction hours required by any statute or rule."[7] The Florida Emergency Order is relevant in this case because Respondent believed she was attending a satellite campus of an approved Florida school. She obtained an LVN-equivalent license

---

[3] Resp. Ex. 6.

[4] Resp. Ex. 6.

[5] Staff Ex. 20 at 7.

[6] Resp. Ex. 5.

[7] Resp. Ex. 5.

(called Licensed Practical Nurse, or LPN, in Florida) from the Florida Board of Nursing (FBON) in February 2021. She then applied for the License in Texas by endorsement based on her LPN license, receiving the License in March 2021. The Florida Emergency Order suspension ended June 26, 2021.[8]

This is a case of first impression.[9] And, as previously noted, this case is both a disciplinary action and a licensure eligibility determination.[10] To facilitate the discussion, the ALJ begins by summarizing the issues, legal standards, and burdens of proof, and previewing the findings and conclusions, before addressing each matter in detail.[11]

Staff makes three contentions in this case.[12] First, Staff argues Respondent participated in Operation Nightingale and obtained the License through fraudulent means by purchasing a fraudulent diploma. Commission of fraud or deceit in obtaining a license can subject a licensee to Board sanctions, as can use of a diploma that has been fraudulently issued, counterfeited, or altered.[13] Staff had the burden to prove its allegations by a preponderance of the evidence. The ALJ finds Staff did not

---

[8] Staff Ex. 13; *see also* Florida Dept. of Health website: News (floridahealthcovid19.gov) (last visited Oct. 20, 2023).

[9] Per Staff, this is the first Operation Nightingale case at SOAH to go to hearing. The Board's website states formal charges have been filed against over 100 nurses and disciplinary action—primarily via voluntary license surrender—has been taken against many others. *See* https://www.bon.texas.gov/Operation_Nightingale_Main.asp.html (last visited Oct. 20, 2023).

[10] *See Staff's Third Amended Formal Charges* (Formal Charges) filed Sept. 6, 2023 (Staff Ex. 3e).

[11] SOAH ALJs have decisional independence; the ALJ's framework in this case may not be appropriate for or adopted in other cases. *See* Tex. Gov't Code §§ 2003.022(d)(2), .041(c).

[12] Staff's Formal Charges list a single Charge which is broken into three parts here for ease of analysis.

[13] Tex. Occ. Code § 301.452(b)(2), (5).

show Respondent committed this alleged misconduct. Disciplinary action is thus not warranted on this factual record.

Staff's second and third allegations relate to Respondent's qualifications. An applicant for licensure by endorsement may demonstrate she is qualified by showing she graduated from a Texas-approved program or that she completed a program with substantially equivalent education standards to a Texas-approved program.[14]

In its second contention, Staff asserts Respondent's nursing program was unapproved. Staff had the burden of identifying the legal basis on which the program is alleged to be unapproved and of producing evidence the program failed to meet that legal standard. Respondent had the burden of persuasion to show she nonetheless is qualified. The ALJ finds Respondent's program was not approved and could not lawfully issue a diploma to qualify Respondent for a Texas license.

Staff's third contention is that Respondent's education is not substantially equivalent to Texas standards. Staff had the burden of identifying the law governing program standards and of producing evidence the program failed to meet the legal standard(s). Respondent had the burden of persuasion to show her qualifications despite Staff's evidence. The ALJ finds Respondent's education was not substantially equivalent to a Board-approved LVN program.

---

[14] Tex. Occ. Code § 301.260; 22 Tex. Admin. Code § 217.5(a)(1).

## III. APPLICABLE LAW

### A. BURDEN OF PROOF

The standard of proof is a preponderance of the evidence.[15] Who bears the burden of proof depends on the statute (here, the Nursing Practice Act (Act), found in chapter 301 of the Texas Occupations Code (Code)), the Board's rules, and documented agency policy.[16] The ALJ may also consider other factors, such as which party seeks affirmative relief and whether a party would be required to prove a negative.[17] Relevant here, the ALJ may weigh the parties' "relative access to and control over information pertinent to the merits of the case."[18]

A "professional license is a property right" of the licensee, but the right "has been created by statute and is subject to the state's power to impose conditions upon the granting or revocation of the license for the protection of society."[19] When it exercises enforcement authority against a licensee, the Board must follow the procedural due process safeguards of the federal and Texas constitutions, which protect "litigants in agency proceedings when the agency 'deprives an individual of life, liberty, or property based on resolution of contested factual issues concerning

---

[15] *Granek v. Tex. St. Bd. of Med. Exam'rs*, 172 S.W.3d 761, 777 (Tex. App.—Austin 2005, no pet.); *Sw. Pub. Servs. Co. v. Pub. Util. Comm'n of Tex.*, 962 S.W.2d 207, 213–14 (Tex. App.—Austin 1998, pet. denied).

[16] 1 Tex. Admin. Code § 155.427.

[17] 1 Tex. Admin. Code § 155.427(3)-(5).

[18] 1 Tex. Admin. Code § 155.427(2).

[19] *Scally v. Tex. St. Bd. of Med. Exam'rs*, 351 S.W.3d 434, 446 (Tex. App.—Austin 2011, pet. denied) (citations omitted).

that individual.'"[20] The process that is due is, "[a]t a minimum, notice and an opportunity to be heard at a meaningful time and in a meaningful manner" before "an impartial factfinder."[21]

Staff's first charge seeks disciplinary action (revocation), asserting Respondent committed fraud in obtaining the License. In exercising enforcement authority, Staff had the burden of proving the existence of facts justifying the sanction. Respondent had the burden to prove any mitigating factors.[22]

Staff's second allegation is that Respondent's program was unapproved, so it "could not lawfully issue [a diploma] valid to form the basis of eligibility for a Texas nursing license."[23] Its third allegation is that the program's content was not substantially equal to Texas standards. Meaningful notice to Respondent requires that she be made aware of how her education was allegedly unapproved or fell short. Staff is in the better position to specify the alleged deficits, given that the Board is responsible for determining and publishing the applicable standards. Therefore, Staff had the burden to identify the standards that apply and produce evidence they were not met. The ALJ references the Notice of Hearing[24] and Formal Charges for the standards Staff put into contention. Respondent—as the person seeking the

---

[20] *Scally*, 351 S.W.3d at 446–47 (citations omitted).

[21] *Scally*, 351 S.W.3d at 447-48 (citations omitted). *See also* Tex. Gov't Code § 2001.051 (addressing, in administrative hearing context, rights to a hearing after reasonable notice of not less than 10 days and to participate in the hearing).

[22] 1 Tex. Admin. Code § 155.427.

[23] Staff Ex. 3e at 9-10.

[24] Staff's *Fifth Amended Notice of Hearing* (Notice of Hearing) filed Sept. 6, 2023 (Staff Ex. 3e).

privilege of continued practice in this state—had the ultimate burden of persuasion to demonstrate she is qualified.

## B. SUBSTANTIVE LAW APPLICABLE TO DISCIPLINARY ACTIONS

A person may not practice nursing in Texas without a Board-issued license.[25] It is a violation to commit "fraud or deceit in procuring or attempting to procure a license" or to use a license or diploma "that has been fraudulently purchased, issued, counterfeited, or materially altered."[26] Staff contends Respondent obtained the License "through fraudulent means by purchasing a fraudulent [diploma] from a fraudulent school"[27] and misled the Board into believing she completed an approved program. Staff did not specify a definition of fraud or deceit, and neither the Act nor Board rules appears to contain one. For the reasons explained in the Analysis section, the ALJ applies the common law definition of fraud.

When a nurse violates the Act or Board rules, the Board is required to impose a disciplinary sanction, which can range from remedial education to license revocation.[28] Because a basis for discipline was not established in this case, the sanction analysis is not addressed.[29]

---

[25] Tex. Occ. Code § 301.251(a).

[26] Tex. Occ. Code § 301.452(b)(2), (5).

[27] Staff Ex. 3e at 9.

[28] Tex. Occ. Code § 301.453; 22 Tex. Admin. Code § 213.33(e).

[29] If the facts establish a basis for sanction, the Board's Disciplinary Matrix and aggravating and mitigating factors must be analyzed. *See* 22 Tex. Admin. Code § 213.33.

## C. SUBSTANTIVE LAW APPLICABLE TO LICENSE ELIGIBILITY

Respondent first obtained a license in Florida and then applied for the License by endorsement. A person licensed in another state may qualify for a temporary license by endorsement by submitting proof of initial licensing by examination and evidence that the person "possessed, at the time of initial licensing as a nurse, the other qualifications necessary at that time to have been eligible for licensing in this state."[30] A person who holds a temporary license may obtain a permanent license if she "verifies [her] academic and professional credentials" and "satisfies any other requirement established by statute."[31] By rule, the Board has specified that licensure by endorsement (whether temporary or permanent) requires proof of graduation from either "an approved Texas nursing education program" or a "program with substantially equivalent education standards[.]"[32]

### 1. "Approved" Nursing Programs

A person may not be certified as a graduate of an approved nursing education program unless the program is (i) approved by the Board; (ii) accredited by a national nursing accreditation agency the Board has determined has acceptable standards; or (iii) approved by the state board of nursing of another state and the Board.[33]

---

[30] Tex. Occ. Code § 301.260(a).

[31] Tex. Occ. Code § 301.260(b).

[32] 22 Tex. Admin. Code § 217.5(a)(1).

[33] Tex. Occ. Code § 301.157(d).

To be approved by the Board to operate a Texas-based program, a vocational nursing education program must be licensed by the Texas Workforce Commission or the Texas Higher Education Coordinating Board, as applicable, and the program's proposal must be approved by the Board.[34] The Board has recognized certain national accreditation agencies as acceptable, as discussed in the Analysis section. If the governing entity of a program has vocational nursing programs in other jurisdictions (for example, a Florida-approved school seeks to operate an extension site in Texas), the program proposal must include evidence that the programs' pass rates for the NCLEX-PN[35] "are at least 80% for the current examination year…and that the nursing programs hold full approval from the state boards of nursing in the other states and are in good standing."[36] Staff alleges Respondent's program met none of these requirements and thus could not lawfully issue a diploma to certify that Respondent graduated from an approved nursing program.

### 2. Substantially Equivalent Education

An LVN program in another state may be deemed to have "substantially equivalent education standards" to a Texas program if:

(i) the program is approved by a state board of nursing or other governmental entity to offer a pre-licensure vocational/practical nursing program of study that awards a vocational/practical nursing certificate, diploma, or degree upon completion;

---

[34] 22 Tex. Admin. Code § 214.3(a)

[35] The NCLEX-PN is for vocational nurses; the NCLEX-RN is for registered nurses (RN).

[36] 22 Tex. Admin. Code § 214.3(a)(2)(B).

(ii) the program's nursing courses include didactic and supervised clinical learning experiences in medical-surgical, maternal/child health, pediatrics, geriatrics, and mental health nursing that teach students to use a systematic approach to clinical decision-making and safe patient care across the life span; and

(iii) the program includes support courses providing a sound foundation for nursing education for the level of preparation.[37]

Staff's Formal Charges identified the following shortcomings in Respondent's nursing education: inadequate curriculum[38] and teaching aids;[39] no pretesting for aptitude for the nursing profession;[40] insufficient instructors with proven qualifications;[41] substandard simulation facilities;[42] no library;[43] and absence of clinical instruction with live patients to develop and assess clinical competencies.[44]

## IV. EVIDENCE

Staff called Respondent as a witness and presented testimony from FBI Special Agent Matthew Lane and Nursing Consultant for Education to the Board

---

[37] 22 Tex. Admin. Code § 217.5(a)(1)(B). Prior to 2022, these requirements were found at 22 Tex. Admin. Code § 217.2. *See* 47 Tex. Reg. 6581-82 (Oct. 7, 2022).

[38] 22 Tex. Admin. Code § 214.9.

[39] 22 Tex. Admin. Code § 214.11(d)(6).

[40] 22 Tex. Admin. Code § 214.8(d)(4).

[41] 22 Tex. Admin. Code §§ 214.7(c)-(d), .10(g)-(h).

[42] 22 Tex. Admin. Code § 214.11(b), (d)(5).

[43] 22 Tex. Admin. Code § 214.11(e).

[44] 22 Tex. Admin. Code §§ 214.9-.10.

Lisa Donnelly, DNP, MA, RN,[45] who was accepted as an expert on nursing education standards. Respondent also testified on her own behalf. The ALJ admitted 25 exhibits for Staff[46] and six for Respondent.[47]

## A. RESPONDENT'S TESTIMONY

Respondent is a native of Nigeria and immigrated to the United States in 2018 with her three younger children to join her two older children who were studying at American colleges in the Houston area. Respondent's husband is a civil engineer for Chevron Nigeria. Although she has a college degree from Nigeria in plant science and biotechnology, Respondent testified she wanted to pursue a career where she could express her empathetic nature. She had cared for her elderly parents and parents-in-law and wanted to help others in need. Respondent heard from a friend about a Certified Nursing Assistant (CNA) program at Faith Health Institute in Houston and completed a 10-week program to obtain a CNA certificate. She then completed a 10-week program to secure a certificate in medication administration, also from Faith Health Institute.

In 2019, Respondent began looking for a nursing school. She identified several options but ruled out those that had waitlists, offered only online instruction, were incompatible with her need to care for her younger children, or were too far from her home in Katy, Texas. A supervisor at work mentioned Sacred Heart International

---

[45] Staff Exhibit 23 contains Dr. Donnelly's *curriculum vitae*. She is not a medical doctor.

[46] Staff Exhibits 1-3, 3a-3e, 4-8, 12-21, 22 (corrected) and 23 were admitted.

[47] Respondent's Exhibits 1-6 were admitted.

and Respondent liked the in-person instruction it offered. Respondent searched online and saw a website for a school of nursing by that name in Florida; she believed she was attending a satellite campus in Texas. For clarity, "Sacred Heart" will be used here to refer to Sacred Heart International Institute, Inc., an FBON-approved nursing school located in Deerfield Beach, Florida. The Houston-based program Respondent attended will be referred to as Sacred Heart Houston (SHH).

SHH required Respondent to submit an essay explaining why she wanted to be a nurse. She was admitted and said she paid a $5,000 deposit, followed by monthly installments of $1,000 for the next 11 months. Orientation began in October 2019 and classes started the next month. Classes met from 9:00 a.m. to 2:00 p.m. on Mondays, Wednesdays, and Fridays, and tests were given every Thursday. The sole instructor was Serge Jean, RN. Mr. Jean used the "Remind" app to communicate with students. Respondent said Mr. Jean used Remind to send PowerPoint presentations to students as well as links to instructional videos, some on YouTube. No textbooks were required, though Mr. Jean provided a list of recommended books. Respondent bought two textbooks for her own use.

According to Respondent, the first quarter included an introduction to computers, medical terminology, and anatomy and physiology. A unit on nursing fundamentals began in the first quarter and continued through the second quarter due to the number of topics covered. Respondent said they learned about ethics, patient rights, and pre- and post-procedure care, among other topics. Students took a final exam at the end of each quarter and could not proceed to the next quarter

without a passing grade. The second quarter began in January 2020 and included a class on critical thinking and a medical-surgical nursing unit.

Around 40 students were in the program. Didactic classes were held in a lecture hall that could hold 50 people and clinical components were taught in a simulation room that could accommodate five students at a time. The simulation room included several mannequins, medication carts, and two beds Respondent said resembled those used in nursing homes. Simulation exercises included using a Pyxis drug dispensing device, measuring and administering medications, and positioning patients. Respondent said the mannequins could make crying sounds.

Near the end of the second quarter, before Spring Break in March, Mr. Jean circulated a list of nursing facilities for clinical rotations. Respondent chose a nursing home near her house. Then, during Spring Break, schools and businesses began closing or moving operations online due to COVID-19.

Respondent was questioned about whether she knew or had reason to suspect SHH was in fact "Jean's NCLEX Review," an unregulated program that was not approved in either Texas or Florida. She acknowledged receiving a letter from Mr. Jean in March 2020 that stated, "Jean's NCLEX is monitoring closely the development of covid-19[.]"[48] She received a second letter on April 20, 2020, stating, "At Jean's NCLEX Review, we know this is an extremely challenging time for everyone" and, "During the past few weeks, Jean's NCLEX Review has made the health and safety of our students, faculty, staff, and extended community…our

---

[48] Staff Ex. 18. The letter is undated but states, "there will be no classes this week (March 16-22)" for Spring Break.

top priority."[49] The letter explained that classes via Zoom videoconference would, "during this time of uncertainty, [enable] Jean's NCLEX Review…to continue helping students…navigate a way forward" to a career in nursing.[50]

At the time, the references to Jean's NCLEX Review did not strike her as odd, Respondent said, because almost all the other documentation she received referenced Sacred Heart. It also did not strike Respondent as unusual that SHH shifted all instruction online, because her children's schools were fully online.

Respondent completed the SHH program in October 2020 and took and passed the NCLEX-PN a few months later. SHH advised students to apply first to the FBON for an LPN license because Sacred Heart was a Florida-based school. That made sense, Respondent said, because she believed she was attending a Texas satellite campus of Sacred Heart. Respondent got her LPN in February 2021. In March 2021, she applied to the Board for a license by endorsement and obtained the License. Respondent said she typed in "Sacred Heart" for her school on the online Texas application and it auto-populated with Sacred Heart's Florida address.[51]

Wanting to continue her education, Respondent next looked at RN programs. Sacred Heart/SHH offered a one-year "bridge" program to help LVNs achieve an RN degree. She started the classes, but after a couple of months students were told the FBON determined the program did not meet requirements. The students were

---

[49] Staff Ex. 19.

[50] Staff Ex. 19.

[51] Staff Ex. 4.

transferred to "Techni-Pro," a separate program based in Florida.[52] Techni-Pro was fully online, though Respondent traveled twice to Florida for clinical rotations. Respondent completed the Techni-Pro program and took the NCLEX-RN exam in January 2023. At that time, news had just emerged about Operation Nightingale and Respondent was under a lot of stress worrying about her degrees. She said the strain affected her performance and she did not pass the NCLEX-RN. Despite the information coming to light about Sacred Heart, Respondent believed she had completed a legitimate course of study to qualify for the License and filed the Renewal application in April 2023. She has since enrolled in a different program and expects to graduate in 2026 with a bachelor's degree in nursing.

Respondent testified she never intentionally misrepresented her education or experience and did not try to fraudulently obtain any license. She believed she was doing everything right and securing genuine diplomas. If she knew in 2019 what she knows now about Sacred Heart and SHH, Respondent "never" would have attended. Respondent noted that since she obtained the License, she has worked part-time as an LVN at various facilities. She has changed jobs a few times but has been steadily employed and has never had any complaints against her.[53] Currently, she works at Heritage, a home health agency. Respondent said her supervisors know of this proceeding and that she was identified in Operation Nightingale, but they continue to employ her. She added that her Florida LPN license is still valid.

---

[52] It is unknown if Techni-Pro was alleged to be involved in Operation Nightingale. However, it is irrelevant to the present inquiry regarding Respondent's LVN education and License.

[53] Respondent's résumé is contained in Respondent Exhibit 4.

## B.   AGENT LANE'S TESTIMONY

Agent Lane is stationed at the FBI's Miami office. He testified that the FBI's Baltimore office received a tip about a local business selling nursing diplomas. Undercover agents purchased diplomas and exposed an alleged conspiracy between private businesses acting as recruiters, primarily in New Jersey, New York, and Texas, and the owners of Florida nursing schools. The recruiters found aspiring nurses and offered instruction geared to passing the NCLEX, and the nursing school owners issued false diplomas and transcripts for the students. Agent Lane explained Operation Nightingale ran a gamut, ranging from individuals who simply exchanged money for a nursing diploma, to those who received minimal instruction, to those who completed more robust programs that included clinical components.

The FBI executed a search warrant at the Sacred Heart premises in Florida and seized documents from Charles Etienne, the school's owner. Agent Lane said Sacred Heart was licensed only in Florida and only to provide on-campus instruction. According to Agent Lane, Mr. Etienne kept records of legitimate students and sent annual graduation lists to the FBON. Though Agent Lane declined to comment on the condition of the records, he testified Mr. Etienne "voluntarily cooperated" and participated in a "collaborative process" with the United States District Attorney's office to review his records and prepare affidavits listing students who were not on graduation lists and therefore—according to Mr. Etienne—were not legitimate students.[54]

---

[54] Staff offered three versions of Mr. Etienne's affidavits as exhibits, none of which was admitted. Because this is a case of first impression, the ALJ documents here the exhibits offered and excluded.

Staff Exhibit 9, submitted with an FBI business records affidavit, contains Mr. Etienne's March 7, 2022 affidavit (March Affidavit), stating he "issued Sacred Heart transcripts and diplomas to 587 individuals listed in Attachment B,

Agent Lane agreed he has not investigated Respondent's case and said he is not contending she committed fraud. He testified that Mr. Etienne pleaded guilty to conspiracy to commit mail fraud and wire fraud and is awaiting sentencing. Agent Lane added that, about a week before the hearing in this case, Mr. Jean and his wife, Ludnie Jean, pleaded guilty to conspiracy to commit wire fraud.

---

who did not receive instruction from Sacred Heart and did not receive the clinical training required to obtain a practical nursing transcript and diploma." Attachment A to the March Affidavit lists 35 students who attended Sacred Heart's Florida-based, on-campus program. All names on Attachments A and B are redacted except for Respondent's name on Attachment B. Also included is a letter on FBI letterhead addressed to Members of the National Council of State Boards of Nursing, forwarding the March Affidavit as well as documents generated by owners of other schools identified in Operation Nightingale. The letter encourages "State Boards of Nursing…to use this information as needed to conduct their own investigations and determine what actions to pursue[.]"

Staff Exhibit 10 is a business records affidavit from Mr. Etienne stating, "Pursuant to a criminal investigation conducted by agents with [HHSC-OIG and the FBI and in] cooperation with these federal agencies, I reviewed various student files of individuals who sought nursing credentials…from Sacred Heart." Based on that review, the affidavit states that Mr. Etienne "ascertain[ed] those individuals who were issued illegitimate degrees by Sacred Heart" and prepared "an affidavit attested to…on March 7, 2022." The student files reviewed are asserted to be "records of regularly conducted business activity" of Sacred Heart, kept by Mr. Etienne in the regular course of business. Although it seems to reference the March Affidavit, no documents are attached to Exhibit 10.

Staff Exhibit 11 is an April 3, 2023 affidavit (April Affidavit) from Mr. Etienne. It states that Mr. Etienne prepared the March Affidavit and its Attachments while represented by counsel and gave the testimony freely; he was the owner and sole custodian of records for Sacred Heart and any student files that existed would be in his possession; and, after a diligent search, he prepared Attachments A and B and believes them to be accurate.

Staff offered Exhibits 9-11 as business records of the FBI, negative business records of Sacred Heart, and/or statements against interest. Further, if the exhibits were deemed inadmissible under the Texas Rules of Evidence (which, as applied in a nonjury civil case in a district court, govern SOAH proceedings per 1 Texas Administrative Code § 155.429(a)(1)), Staff petitioned that an exception should be made pursuant to section 2001.081 of the Administrative Procedure Act. Tex. Gov't Code § 2001.081. This provision allows otherwise inadmissible evidence to be admitted if it is necessary to ascertain facts not reasonably susceptible of proof under the Texas Rules of Evidence, not precluded by statute, and of a type "on which a reasonably prudent person commonly relies in the conduct of the person's affairs." *Id.* Staff noted that Messrs. Etienne and Jean are outside the Board's subpoena power; per Agent Lane, both are in federal custody and will not be released to testify in civil proceedings such as this.

The ALJ sustained Respondent's hearsay objections to Staff Exhibits 9-11, finding they were offered for the truth of the matters asserted therein, namely that Respondent participated in a fraudulent scheme and was issued an illegitimate degree by Sacred Heart. The March and April Affidavits were prepared in anticipation of litigation; compiling lists of legitimate and illegitimate students is not a regularly conducted business activity of a school of nursing. The FBI provided the affidavits to state boards of nursing to use in conducting their own investigations, and the documents are not conclusive evidence of wrongdoing. Furthermore, the facts sought to be ascertained by these exhibits are reasonably susceptible of proof under evidence that is admissible and was admitted, as discussed in the Analysis section. Therefore, Staff Exhibits 9-11 were not admitted.

## C. DR. DONNELLY'S TESTIMONY

Dr. Donnelly holds associate and master's degrees in nursing, bachelor's and master's degrees in English, and a doctorate in nursing practice. She worked from 1996 to 2011 as a nurse in various hospital settings, including the emergency room, medical-surgical floor, and post-anesthesia care. From 2007 to 2020, she was also a clinical instructor for LVN students, an educator in a simulation laboratory, and an instructor for didactic and clinical LVN and RN students at community colleges and a public university. In 2021, she joined the Board as a consultant. Among other duties, she surveys Texas nursing programs to evaluate their compliance with applicable law, reviews new program proposals and curriculum changes, and makes recommendations to the Board regarding nursing education matters.

Dr. Donnelly provided evidence (through live testimony and her expert report) about Board records of approved programs. That testimony was uncontested and is incorporated in the Analysis section.

Dr. Donnelly also provided evidence regarding Staff's allegation that Respondent's education fell short didactically and clinically. Based on the deficiencies she identified, Dr. Donnelly opined that SHH did not meet minimum standards for Texas LVN programs and Respondent could not claim she received a substantially equivalent education. The areas identified in the Notice of Hearing and Formal Charges and addressed by Dr. Donnelly were the SHH curriculum (including pretesting and educational materials used), faculty, facilities, and clinical

component.[55] She evaluated the documentation available for SHH, including a curriculum outline, syllabus, videos of some class sessions, and Respondent's deposition.[56] Dr. Donnelly distinguished the SHH materials from the FBON-approved program outline for Sacred Heart, which is also in evidence.[57] No party claimed the Sacred Heart program outline was followed by SHH, and it is only discussed in the Analysis section, solely for purposes of contrasting it with SHH.

## 1. SHH's curriculum deficiencies

Texas LVN programs are required to pretest students to assess reading comprehension and mathematical ability.[58] Dr. Donnelly said no pretesting was done other than the essay Respondent wrote stating why she wanted to be a nurse.[59]

LVN nursing education must include both didactic and clinical instruction in five subject areas: medical-surgical, maternal/child health, pediatrics, geriatrics, and mental health nursing.[60] Instruction must be provided in "biological, physical, social, behavioral, and nursing sciences, including body structure and function,

---

[55] The discussion in this section incorporates both Dr. Donnelly's live testimony and her expert report.

[56] Respondent said that once SHH moved its instruction online, she recorded a few classes for her own reference. The recordings were provided to Staff and Dr. Donnelly stated she reviewed them. The videos, deposition, and other underlying documents reviewed by Dr. Donnelly are not in the record.

[57] Staff Ex. 12.

[58] 22 Tex. Admin. Code § 214.8(d)(4). Dr. Donnelly's testimony and Staff's Formal Charges referred to pretesting for "aptitude for the nursing profession," though the rule refers generically to reading and mathematical ability. Nonetheless, there is no evidence SHH conducted pretesting.

[59] Staff Ex. 20 at 5-6.

[60] 22 Tex. Admin. Code § 217.5(a)(1)(B) (addressing licensure by endorsement). Substantially the same list is in the Board's general rule on vocational programs of study. *See* 22 Tex. Admin. Code § 214.9(e)(1)-(5).

microbiology, pharmacology, nutrition, signs of emotional health, human growth and development, vocational nursing scope of practice, and nursing skills."[61]

Dr. Donnelly noted that SHH had a single syllabus for all courses, and the available documents do not show that instruction was provided in all five mandated subjects. The curriculum document has columns for course numbers and names, clock hours, and credit hours, but no totals are documented, and the number of hours required for graduation is not stated.[62]

A Board-approved LVN curriculum must include written clinical objectives and outcome measures.[63] None were evident in Dr. Donnelly's review, and "the skills checklists provided is a blank 'LPN Competency/Skills Checklist' from 'West Virginia Nursing Network, LLC.'"[64] Programs are required to provide teaching aids that "meet the objectives/outcomes of the program."[65] However, no textbooks were required, and Mr. Jean used "YouTube videos as teaching aids…and PowerPoint lessons copyrighted in 2014."[66] Per Dr. Donnelly, "use of expert-authored textbooks in any nursing program is regarded as a fundamental requirement" for students to understand the scientific rationale for techniques and interventions.[67]

---

[61] 22 Tex. Admin. Code § 214.9(b)(2).

[62] Staff Ex. 20 at 4-5.

[63] 22 Tex. Admin. Code § 214.9(g)(3), (h).

[64] Staff Ex. 20 at 4.

[65] 22 Tex. Admin. Code § 214.11(d)(6).

[66] Staff Ex. 20 at 7.

[67] Staff Ex. 20 at 6.

## 2. SHH's faculty deficiencies

LVN programs must employ "sufficient faculty members with educational preparation and expertise necessary to enable the students to meet the program goals."[68] Faculty must show "evidence of teaching abilities and maintaining current knowledge, clinical expertise, and safety in the subject areas of teaching responsibility."[69]

Dr. Donnelly said evidence of Mr. Jean's qualifications was limited, at best, and his competence as an instructor was unknown. She doubted a single instructor could be expert enough to adequately teach all components of a nursing program, especially while also grading exams, mentoring students, supervising simulations and clinical rotations, and maintaining up-to-date knowledge and clinical expertise.[70] Even if Mr. Jean had the expertise to deliver all the lectures in all of the subject areas, the ratio would violate Board rules setting limits on the number of students for whom a faculty member may be a clinical preceptor, instructor, or supervisor, which varies from ten to 24 students based on the circumstances.[71]

In addition, faculty are responsible for formative and summative evaluations and for clinical practice evaluations to ensure students meet course objectives and

---

[68] 22 Tex. Admin. Code § 214.7(c)

[69] 22 Tex. Admin. Code § 214.7(d)(2)(D).

[70] Staff Ex. 20 at 3.

[71] 22 Texas Admin. Code §§ 214.7(c), .10(g)-(h); *see also* Staff Ex. 20 at 3-4.

demonstrate required skills.[72] Dr. Donnelly found no evidence that evaluations were done.[73]

### 3. Shortcomings of SHH's facilities

The skills laboratory of an LVN program must "accommodate the maximum number of students allowed for the program" and be "appropriately equipped" so that "students can receive instruction and demonstrate all basic nursing skills."[74] Dr. Donnelly said there would ordinarily be multiple simulation rooms for an LVN program, and each room would have the same equipment a nurse would encounter in a hospital room, such as IV poles and pumps, privacy curtains, a sink to practice routine handwashing, a crash cart, and multiple beds and mannequins. Mannequins should be high-fidelity, meaning they can talk and blink, and students can draw blood, start an IV, defibrillate the mannequin, insert a chest tube, listen for heart and bowel sounds, and more. Programs should have a "library [and] departmental holdings" that are "current, use contemporary technology appropriate for the level of the curriculum, and [are] sufficient for the size of the student body and the needs of the faculty."[75]

Dr. Donnelly said the five-person capacity of the SHH simulation room was lower than any she has encountered at an approved program, particularly given that there were 40 students in Respondent's class. The room lacked a sink, crash cart,

---

[72] 22 Tex. Admin. Code § 214.10(f).

[73] Staff Ex. 20 at 5.

[74] 22 Tex. Admin. Code § 214.11(b).

[75] 22 Tex. Admin. Code § 214.11(e).

and other equipment. The mannequins Respondent described appeared to be moderate fidelity at best. In addition, simulation labs usually have debriefing rooms where students can receive feedback from instructors, but SHH did not. Dr. Donnelly added that SHH had no computer lab or library for students.[76]

### 4.    Inadequacy of SHH's clinical component

Approved LVN programs in Texas must provide clinical experience in all five required subject areas.[77] Clinical rotations must be selected and planned by faculty and supervised by faculty or approved clinical preceptors.[78]

Dr. Donnelly testified that passing the NCLEX shows a student's knowledge, but not her ability to apply that information to a practical situation. In Dr. Donnelly's opinion, simulations have a valuable role in nursing education because they are pre-programmed by the instructor, predictable, and a safe way for students to make mistakes that can be reviewed and corrected without real-life consequences. However, she stressed, simulations can only augment the clinical program, not substitute for a clinical rotation.

Among other things, Dr. Donnelly noted that clinical rotations give students perspective on the types of patients they may encounter. Patients can vary tremendously in their backgrounds, quirks, physical conditions, acuity of illnesses,

---

[76] Staff Ex. 20 at 6-7.

[77] 22 Tex. Admin. Code § 214.9(e).

[78] 22 Tex. Admin. Code § 214.10(c), (g)-(h).

and other attributes. Two patients diagnosed with the same condition will not respond in the same way. Some may have skin integrity issues or limb problems that pose special challenges for positioning and treating them. Patients' families are another variable because they may need or want to participate in treatment decisions. Nurses must be able to interact with patients, families, and other members of the health care team, and sort and prioritize patient needs. Dr. Donnelly said some "gross motor skills" are only acquired through hands-on practice, including spiking a bag of saline, using syringes, removing pills from packaging, using a stethoscope, and feeling for a pulse.

Although Respondent's clinical rotations were canceled due to COVID-19, Dr. Donnelly denied that Texas nursing programs were allowed to fully substitute simulations for clinical experience during the period of Governor Abbott's disaster declaration. The declaration allowed simulation to exceed 50 percent of clinical hours, but simulation could not replace all clinical hours.[79] She explained that the Board conducts a yearly survey of all approved Texas nursing programs and gathers data on classroom and clinical hours.[80] Based on the survey, Dr. Donnelly knows of no legitimate program in Texas that did not provide in-person clinical rotations for its students, even during COVID-19. Some programs front-loaded clinical practice; others prolonged the course of study to allow students to do clinical rotations after COVID restrictions eased. Still others continued their pre-COVID clinical components because their partner facilities continued to allow student rotations. Averaged across all approved Texas LVN programs, students performed a minimum

---

[79] Dr. Donnelly did not indicate whether there was an upper limit on the number or percentage of simulation hours.

[80] Staff Ex. 14.

of 255 hands-on clinical hours in 2019, 176 hours in 2020, 96 hours in 2021, and 176 hours in 2022.[81] Maximum numbers of clinical hours performed in the same time frame ranged from 898 to 1408 hours.[82]

Further, Dr. Donnelly said she has never seen a legitimate program, whether in Texas or out-of-state, that waits several months to have LVN students start hands-on clinical practice. Most programs start within the first two weeks or so, because clinical settings are "where the learning really takes place." She noted that SHH had four to five months in which clinical rotations could have been conducted prior to COVID-19 restrictions taking effect.

Dr. Donnelly opined that Respondent's work experience as a CNA and medication aide cannot substitute for supervised clinical rotations. CNAs and medication aides function as resources. An LVN has a defined scope of practice to conduct focused patient surveys,[83] can make "life and death decisions," and has greater responsibility in an emergency. Respondent's work as an LVN since March 2021 also cannot offset the deficit, Dr. Donnelly said. She described faculty as playing a special role because they can identify signs or cues from patients that a student or even an experienced nurse may not recognize, and they can give feedback and insight on the choice of interventions. Thus, faculty-supervised clinical experience is crucial to developing the skills expected of a licensed LVN.

---

[81] Staff Ex. 20 at 8. As noted, Governor Abbott's waiver in Texas was effective March 21, 2020, to September 1, 2022.

[82] Staff Ex. 20 at 8.

[83] Dr. Donnelly said RNs have a broader scope of practice and are responsible for comprehensive patient surveys.

Even assuming simulations could suffice, Dr. Donnelly said the simulations Respondent did through SHH did not cover all five required subject areas to be deemed "substantially equivalent" to a Texas-approved program. SHH had no written clinical learning objectives and no evidence students received evaluations.

Dr. Donnelly concluded Respondent's training fell short of being substantially equivalent to a Texas-approved program in multiple ways. She noted nursing is historically one of the most trusted professions and the Board's duty is to protect the public by preventing unqualified nurses from practicing in Texas. In Dr. Donnelly's opinion, allowing Respondent to continue practicing poses "a grave risk to the public" because Respondent lacks supervised clinical training in skills such as using critical thinking, emergency response, and working with the health care team.

## V.   ANALYSIS

### A.   RESPONDENT DID NOT COMMIT FRAUD OR DECEIT IN OBTAINING THE LICENSE

The Act authorizes disciplinary action against a person who commits fraud or deceit in procuring or attempting to procure a license (Code section 301.452(b)(2)) or who uses a diploma that has been fraudulently issued, counterfeited, or materially altered (Code section 301.452(b)(5)).[84] The required mental state is a threshold issue. For Code section 301.452(b)(2), what *mens rea* must be proven to show a person fraudulently obtained a license? For Code section 301.452(b)(5), is it

---

[84] The provisions cited cover several types of wrongdoing. Given that Staff's Formal Charges focused on fraud (alleging Respondent obtained the License "through fraudulent means by purchasing a fraudulent [diploma] from a fraudulent school"), the ALJ follows suit.

necessary to show the person using the diploma knows it is fraudulent? Staff did not cite a definition of fraud and neither the Act nor Board rules appears to contain one.

Of note, the Texas Legislature recently amended the Medical Practice Act provision addressing false statements to add the word "knowingly" so that it is an offense if a person "*knowingly* makes a false statement…in the person's application for a license[.]"[85] The offense is a Class A misdemeanor "unless the actor's intent is to defraud or harm another, in which event the offense is a state jail felony."[86]

Without specific language in the Act or Board rules, a general definition is appropriate. Fraud is "multiform and as such has no single, all-encompassing definition."[87] Fraud is "defined as 'trickery or deceit,' 'intentional misrepresentation, concealment, or nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him,' or 'a false representation of a matter of fact…that deceives or is intended to deceive another so he shall act upon it to his legal injury.'"[88] Common law fraud requires that (1) a speaker made a representation; (2) the representation was material; (3) the representation was false; (4) when the representation was made, the speaker (A) knew the representation was false or (B) made the representation recklessly, as

---

[85] Tex. Occ. Code § 165.154(a)(1) (emphasis added). The provision previously did not specify *mens rea* and stated that a person "commits an offense if the person makes a false statement" in a license application. A violation constituted "tampering with a governmental record or perjury as prohibited by the Penal Code." Tex. Occ. Code § 165.154, *prior to* Sept. 1, 2023 amendment; *see* Acts 2023, 88th Leg., R.S., ch. 827 (H.B. 1998), § 12, eff. Sept. 1, 2023.

[86] Tex. Occ. Code § 165.154(b).

[87] 41 Tex. Jur. 3d, *Fraud and Deceit*, § 1 (Third Ed.).

[88] *In re E.P.*, 185 S.W.3d 908, 910 (Tex. App.—Austin 2006, no pet.) (citing *Webster's Third New International Dictionary* 904 (1986)).

a positive assertion, and without knowledge of its truth; (5) the speaker made the representation intending that another act on it; (6) the other person relied on the representation; and (7) the representation caused the other person injury.[89]

It is undisputed Respondent met the qualifications of passing the NCLEX-PN and the Board's nursing jurisprudence exam. Applying the common law definition of fraud, Staff needed to show Respondent knew of the falsity, or at a minimum was reckless with respect to the truth, of the representation in her applications that she had a valid diploma.

The ALJ finds Respondent sincerely wants to be a qualified nurse and took all of her programs of study seriously. Respondent credibly testified she believed SHH was legitimate and a satellite school of Sacred Heart. She was a recent immigrant who learned about both her schools (Faith Health Institute and SHH) via word-of-mouth from people she trusted, and she checked the website for Sacred Heart and saw it was a Florida-approved school. In the context of a pandemic and a rapid, nationwide shift to online operations for schools and businesses, it is reasonable Respondent believed her didactic and clinical education could take place fully online.[90] When she applied for a Florida LPN license and then a Texas license by endorsement, Respondent was following the procedure she was told and believed

_____

[89] See "Fraud," O'Connor's Texas Causes of Action Ch. 12-A § 1 (2023 ed.) (collecting cases). Respondent (1) made a representation to the Board that she was qualified. The representation (2) was material to the license being approved and (3) is presumed false for purposes of this discussion. Respondent (5) made the representation with the intent that the Board rely on it and grant her a license. The Board (6) relied on the representation, and (7) suffered injury to its goal of protecting the public by only licensing qualified nurses. The only part of the definition that is in question for this discussion is (4) Respondent's mental state when she made the representation.

[90] As discussed below, Florida schools were permitted to conduct both didactic and clinical education fully online, further supporting the reasonableness of Respondent's beliefs.

to be proper. She credibly stated that when she typed in Sacred Heart as her school on the online application, a Florida address auto-populated. Respondent emphatically and persuasively said she "never" would have gone to SHH if she had known it was not approved in Texas or Florida and (allegedly) was part of a fraudulent scheme as indicated in Operation Nightingale.

Respondent also reasonably and sincerely believed she qualified to continue holding the License when she filed the Renewal in April 2023. Operation Nightingale had been announced a few months earlier and investigators alleged that some aspiring nurses exchanged cash for diplomas, but Respondent had completed a year-long program and passed the NCLEX-PN and Board nursing jurisprudence exam. A person wanting to buy a nursing diploma with the least possible effort would not be enrolled, as Respondent is, in her third nursing program with a scheduled graduation in 2026. Respondent has devoted years of her life and significant funds[91] to securing a valid license. She pointed out her LPN license remains valid in Florida, further supporting her belief that her Texas License was validly obtained and that submitting the Renewal application was not fraudulent.[92]

The evidence does not demonstrate Respondent was reckless as to the truth of the representations she made to the Board in obtaining her License or filing the Renewal. Staff did not establish fraud in violation of Code section 301.452(b)(2) or

---

[91] Respondent paid around $16,000 for her SHH program. It is unknown how much the bridge program through Techni-Pro cost, and Respondent is now in a bachelor's degree RN program.

[92] The status of the LPN license is the FBON's purview. The Board has jurisdiction to determine whether the credentials Respondent presented are sufficient to hold a Texas license.

(5). However, Respondent's diploma was and is not adequate for purposes of Texas licensure, as explained in the next sections.

## B.    SHH/SACRED HEART WAS NOT APPROVED BY THE BOARD

An applicant for licensure by endorsement may satisfy the Board's requirements by showing she graduated from an approved program. A program may be (i) approved by the Board; (ii) accredited by a national nursing accreditation agency the Board determines has acceptable standards; or (iii) approved by another state's board of nursing and accepted by the Board.[93] Dr. Donnelly determined Sacred Heart and SHH met none of these requirements, and the ALJ agrees.[94]

According to an affidavit from Sherri Sutton-Johnson, FBON Director of Nursing Education, the FBON approved Sacred Heart on November 7, 2013.[95] Neither party claims Sacred Heart, or any purported Sacred Heart extension site in Texas, existed prior to that date. The Board has approved 93 new Texas programs of nursing education (at all levels) since September 1, 2006, in addition to those in existence prior to that date.[96] On August 19, 2019, shortly before Respondent started the SHH program, there were 87 approved LVN education programs in Texas.[97] If SHH was authorized to operate in Texas, it would have obtained approval by the

---

[93] Tex. Occ. Code §§ 301.157(d), .252(a)(2).

[94] Staff Ex. 20 at 2. This section references parts of Dr. Donnelly's expert report that were not discussed in the Evidence section to avoid repetition, along with other uncontested evidence.

[95] Staff Ex. 13 at 2. Respondent did not object to the admissibility of this affidavit.

[96] Staff Ex. 21.

[97] Staff Ex. 22 (corrected).

Texas Workforce Commission or Texas Higher Education Coordinating Board and Board approval of a program proposal, and it would be on the list of approved LVN programs.[98] Dr. Donnelly determined SHH did not apply for approval in Texas and was not recognized as a Texas LVN education program.[99]

If an existing out-of-state school such as Sacred Heart seeks to operate an extension site in Texas, it must also submit a program proposal, and it must have an NCLEX pass rate of 80 percent. Dr. Donnelly said Sacred Heart never applied to the Board for a Texas extension site, and its NCLEX pass rates were between 26 and 36 percent for the 2020 to 2022 period.[100]

The Board has recognized accreditation agencies including the Commission on Collegiate Nursing Education (CCNE) and the Accreditation Commission for Education in Nursing (ACEN) as having acceptable standards.[101] Dr. Donnelly found neither Sacred Heart nor SHH had national accreditation from CCNE, ACEN, or any other Board-recognized accreditation agency.

The final possibility is that Respondent attended a program approved by another state's board and accepted by the Board. Ms. Sutton-Johnson's affidavit states the FBON approved Sacred Heart "as an in-person nursing education

---

[98] Staff Ex. 20 at 2-3.

[99] Staff Ex. 20 at 2.

[100] Staff Ex. 20 at 3.

[101] Staff Ex. 22 (corrected).

program" that "was not approved for online instruction."[102] However, the affidavit notes that from March 21, 2020, to June 26, 2021, the Florida State Surgeon General's Emergency Order permitted supervised remote live videoconferencing and simulation to substitute for all supervised clinical instruction hours required by statute or rule.

It appears that, while Sacred Heart was not initially FBON-approved to provide online instruction, it was allowed to conduct all didactic and clinical instruction online and via simulations during the effective period of the Emergency Order. It is possible a Sacred Heart student could have received a diploma in Florida after completing clinical instruction entirely via simulation. If such a student obtained a valid Florida LPN license, the Board might approve her licensure in Texas by endorsement. However, Respondent does not stand in this hypothetical student's shoes.

Though Respondent credibly testified she believed she was attending a satellite program of Sacred Heart, it is starkly obvious the program Sacred Heart was approved to provide in Florida is not what SHH provided. For example, the FBON-approved program outline for Sacred Heart lists 14 required textbooks and sets out 13 courses (with specified clock hours) covering all five required subject areas of LPN/LVN education.[103] Program objectives are detailed, and a program description is provided. The simulation lab at Sacred Heart is described as a simulated hospital unit equipped with six electric hospital beds, IV stands, over-bed

---

[102] Staff Ex. 13 at 2-3.

[103] Staff Ex. 12 at 2-3.

tables, privacy curtains, sinks, and an instructor's station, and offered newborn, pediatric, adult, and geriatric mannequins.[104] The program Respondent completed lacked most of these features and thus was not one that was approved by the FBON and (potentially) accepted by the Board.

Staff's evidence showed Respondent's program was not an approved nursing education program. Respondent did not meet her burden of persuasion to show she is nonetheless qualified.

## C. SHH DID NOT PROVIDE A SUBSTANTIALLY EQUIVALENT EDUCATION TO A BOARD-APPROVED PROGRAM

The starting point for an LVN program in another state to be deemed substantially equivalent to a Texas-approved program is that it includes "didactic and supervised clinical learning experiences in medical-surgical, maternal/child health, pediatrics, geriatrics, and mental health nursing that teach students to use a systematic approach to clinical decision-making and safe patient care across the life span" and "includes support courses providing a sound foundation for nursing education for the level of preparation."[105]

Dr. Donnelly has extensive experience as a nurse, an educator, and now a Board consultant responsible for evaluating nursing education programs. Her testimony regarding the ways in which SHH fell short of Texas standards for an LVN program was unchallenged. SHH had a deficient curriculum; was inadequately

---

[104] Staff Ex. 12 at 3.

[105] 22 Tex. Admin. Code § 217.5(a)(1)(A)(iii), (B)(iii); *see also* Tex. Occ. Code § 301.157(d-4).

staffed with faculty of unproven competence; provided substandard simulation facilities and no library or computer lab; and did not include supervised clinical rotations that were at least partially in-person and covered all required subject areas.

Staff's evidence showed Respondent did not complete a program of nursing education substantially equivalent to a Texas-approved program. Respondent did not meet her burden of persuasion to prove she is nonetheless qualified.

## D.    RECOMMENDATION

The FBI and HHSC-OIG assert that 7,600 individuals nationwide are implicated in the Operation Nightingale scheme to obtain nursing licenses via illegitimate diplomas and transcripts. As Agent Lane testified, the scheme ran a gamut from a pure exchange of cash for a diploma to programs that spanned several months and included didactic and clinical components. He indicated the alleged participants in Operation Nightingale who are relevant to this case— Messrs. Etienne and Jean—have pleaded guilty to federal charges of conspiracy to commit mail fraud and/or wire fraud and are awaiting sentencing. The ALJ does not comment on those prosecutions, which were still pending when the record closed in this case. Assuming, however, that SHH was part of a fraudulent scheme, the evidence indicates Respondent was an unwitting participant. She was not shown to have engaged in fraud, deceit, or misrepresentation, and Staff's requested disciplinary action (revocation) is not warranted on that basis.

The ALJ notes Dr. Donnelly's view that Respondent poses a "grave risk" to public safety if allowed to keep the License, but also recognizes there is no evidence

Respondent has had any safety or disciplinary issues at any of the LVN jobs she has held since her licensure over two years ago. The risk she poses is further belied by the decision of Respondent's employer to keep her on staff even after knowing of Staff's charges and that Respondent was alleged to have been involved in Operation Nightingale. The Board has the option of temporarily, and summarily, suspending or restricting a license based on evidence that a nurse's continued practice "would constitute a continuing and imminent threat to the public welfare."[106] Such a suspension can be implemented within a short timeframe and does not seem to have been pursued against Respondent.

Nonetheless, the Board is charged with regulating the practice of nursing in Texas with the aim of ensuring public safety. Respondent did not receive a didactic or clinical education in all required subject areas of LVN nursing practice, so she lacks the required foundation. Though Respondent has work experience as a CNA, medication aide, and LVN, Dr. Donnelly credibly pointed out that some more subtle signs of patient needs may not be understood, and the appropriate intervention may not be identified, without experience developed through faculty-supervised clinical rotations. In sum, Respondent does not meet Board standards for licensure. As an eligibility matter, the Board should uphold Staff's proposed denial of the Renewal.

## VI. FINDINGS OF FACT

1. Edith Okechukwu Omietimi (Respondent) received a Licensed Practical Nurse (LPN) credential from the Florida Board of Nursing (FBON) on February 12, 2021. She applied to the Texas Board of Nursing (Board) for a

---

[106] Tex. Occ. Code § 301.455.

Licensed Vocational Nurse (LVN, equivalent to LPN) license and was issued LVN License No. 1032052 (License) by the Board on March 22, 2021.

2. On April 7, 2023, Respondent submitted an application to renew the License (Renewal). The Staff of the Board proposed to revoke the License and to deny the Renewal, and Respondent timely requested a contested-case hearing before the State Office of Administrative Hearings (SOAH).

3. On September 6, 2023, Staff sent Respondent its Fifth Amended Notice of Hearing and Third Amended Formal Charges. Together, the Notice of Hearing and Formal Charges contained a statement of the time, place, and nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and either a short, plain statement of the factual matters asserted or an attachment that incorporated by reference the factual matters asserted in the complaint or petition filed with the state agency.

4. SOAH Administrative Law Judge Pratibha J. Shenoy convened the hearing on the merits via Zoom videoconference on September 25, 2023. Deputy General Counsel John Vanderford represented Staff. Respondent appeared and was represented by attorneys John Shepperd and Lina Al-Salim. The record closed the next day, upon the filing of admitted exhibits.

5. In January 2023, the Federal Bureau of Investigation (FBI) and the federal Health and Human Services Commission-Office of Inspector General (HHSC-OIG) announced "Operation Nightingale," a law enforcement action against participants in a fraudulent nursing diploma scheme. Around 7,600 individuals nationwide were identified as participants in a scheme to obtain fraudulent nursing degrees and transcripts that allowed them to sit for the National Council Licensing Examination (NCLEX) and, if they passed the NCLEX, to obtain licenses to practice nursing.

6. Operation Nightingale exposed an alleged conspiracy between private businesses acting as recruiters, primarily in New Jersey, New York, and Texas, and the owners of South Florida nursing schools. The recruiters found aspiring nurses and offered instruction that was geared to passing the NCLEX, and the nursing school owners issued false diplomas and transcripts for the students. The alleged scheme ran a gamut, ranging from those who simply exchanged money for a nursing diploma, to those who received minimal

instruction, to those who completed more robust programs that included clinical components.

7. Sacred Heart International Institute, Inc. (Sacred Heart) was located in Deerfield Beach, Florida, and was approved by the FBON on November 7, 2013, as an in-person nursing education program. It was not approved for online instruction. Charles Etienne was the owner of Sacred Heart.

8. Serge Jean was the sole instructor for what purported to be a Houston-based satellite campus of Sacred Heart (for convenience, referred to here as Sacred Heart Houston or SHH).

9. Respondent is a native of Nigeria and immigrated to the United States in 2018 with her three younger children to join her two older children who were studying at American colleges in the Houston area.

10. Respondent heard from a friend about a Certified Nursing Assistant (CNA) program at Faith Health Institute in Houston and completed a 10-week program to obtain a CNA certificate. She then completed a 10-week program to secure a certificate in medication administration, also from Faith Health Institute.

11. While working as a CNA and medication aide, Respondent researched nursing programs. She heard from a supervisor about Sacred Heart and enrolled at SHH in October 2019.

12. Respondent sincerely believed SHH was a legitimate nursing education program and an authorized satellite campus of Sacred Heart, a Florida-approved school.

13. Respondent attended in-person classes five hours a day, three days per week, at SHH from November 2019 to March 2020. She took in-person exams at SHH one day each week during that time. The classes included activities in a simulation lab.

14. Respondent was scheduled to do an in-person clinical rotation at a Houston nursing home through SHH in March 2020, after Spring Break.

15. In March 2020, Mr. Jean sent students a letter stating that he was monitoring the impact of COVID-19. The correspondence from Mr. Jean referenced "Jean's NCLEX Review," not SHH or Sacred Heart.

16. On March 21, 2020, Governor Abbott issued a disaster declaration in Texas that allowed the Board to modify certain rules. A Board rule limits clinical learning to no more than 50 percent simulation activities, but that requirement was modified to allow students in their final year of a nursing education program to exceed the 50 percent limit to enable them to graduate and join the workforce at a time when nurses were in great demand. The waiver expired on September 1, 2022.

17. On March 21, 2020, the Florida State Surgeon General issued an Emergency Order suspending requirements for didactic and clinical nursing programs. The Emergency Order allowed programs—with the approval of the appropriate administrator—to substitute supervised remote live videoconferencing for didactic hours and simulation for all supervised clinical instruction hours required by any statute or rule. The suspension ended June 26, 2021.

18. On April 20, 2020, Mr. Jean sent students a second letter, advising that all classes, including didactic and clinical instruction, would be conducted online via videoconference due to COVID-19 precautions. The correspondence from Mr. Jean referenced "Jean's NCLEX Review," not SHH or Sacred Heart.

19. Despite the references to Jean's NCLEX Review in Mr. Jean's letters, Respondent reasonably and sincerely believed her program was SHH, affiliated with Sacred Heart.

20. Due to the COVID-19 pandemic, schools and businesses nationwide engaged in a rapid shift to online operations, including Respondent's children's schools.

21. Respondent reasonably and sincerely believed her program was authorized to provide all instruction online.

22. Respondent completed the SHH program in October 2020 and took and passed the NCLEX-PN (for vocational or practical nurses) a few months later.

She then obtained her Florida LPN license and the Texas License by endorsement.

23. Respondent enrolled in a one-year bridge program offered by Sacred Heart/SHH to help LVNs achieve a registered nurse (RN) license. After a couple of months, students were told the FBON determined the program did not meet requirements. The students were transferred to Techni-Pro, a separate program based in Florida, and restarted the bridge curriculum.

24. Respondent completed the Techni-Pro bridge program and sat for the NCLEX-RN exam in January 2023.

25. Also in January 2023, Respondent was identified as potentially involved in Operation Nightingale, along with at least 100 other Texas nurses.

26. Respondent was under a lot of stress worrying about her degrees, which affected her performance. She did not pass the NCLEX-RN.

27. When Respondent submitted the Renewal application in April 2023, she continued to believe she had completed a legitimate one-year program and, because she passed the NCLEX-PN and Board nursing jurisprudence exam and held a valid Florida LPN license, that she met the requirements to hold the License.

28. Respondent has since enrolled in a different program and expects to graduate in 2026 with a bachelor's degree in nursing.

29. Mr. Etienne (the owner of Sacred Heart) has entered a guilty plea to federal charges of conspiracy to commit mail fraud and wire fraud and is awaiting sentencing.

30. In September 2023, Mr. Jean and his wife, Ludnie Jean, pleaded guilty to conspiracy to commit wire fraud and are awaiting sentencing.

31. Respondent paid around $16,000 for the SHH program and additional sums for the Techni-Pro bridge program and the bachelor's degree program in which she is currently enrolled. She has dedicated several years of her life and shown determination in pursuing a nursing degree.

32. Respondent genuinely believed she was enrolled in legitimate programs and properly obtaining a nursing education. She would not have attended SHH if she had known it was not approved in Texas or Florida and alleged to be part of Operation Nightingale.

33. There is no record evidence that Respondent committed fraud in the representations she made to the Board for her License application or the Renewal.

34. Since she obtained the License, Respondent has worked part-time as an LVN at various facilities. She has changed jobs a few times but has been steadily employed and has never had any complaints against her.

35. Currently, Respondent works at Heritage, a home health agency. Her supervisors are aware of this proceeding and that she was identified in Operation Nightingale, but they continue to employ her.

36. SHH was not approved by the Board to offer LVN instruction as a Texas-based program.

37. Sacred Heart was not approved by the Board to offer LVN instruction at a satellite or extension site in Texas.

38. Neither Sacred Heart nor SHH held accreditation from a national accreditation agency recognized by the Board as having acceptable standards.

39. The program of study that the FBON approved for Sacred Heart is not the same as what was provided to Respondent by SHH.

40. SHH did not pretest its students to assess reading comprehension and mathematical ability.

41. Respondent's education at SHH did not cover all five subject areas required by the Board for LVN nursing education to be considered substantially equivalent to a Texas-approved program (medical-surgical, maternal/child health, pediatrics, geriatrics, and mental health nursing).

42. SHH did not provide instruction as required by the Board in biological, physical, social, behavioral, and nursing sciences, including body structure and function, microbiology, pharmacology, nutrition, signs of emotional

health, human growth and development, vocational nursing scope of practice, and nursing skills.

43. The SHH curriculum did not include written clinical objectives and outcome measures, did not provide teaching aids that met the objectives and outcomes of the program, and had no required textbooks.

44. Mr. Jean was the sole instructor for SHH. SHH did not employ sufficient faculty members to enable its class of 40 students to meet program goals.

45. SHH did not have faculty with demonstrated teaching abilities and current knowledge and clinical expertise.

46. There is no evidence SHH faculty performed formative and summative evaluations and clinical practice evaluations of students.

47. The skills/simulation lab at SHH could accommodate five students at a time and was not adequately equipped to allow students to receive instruction and demonstrate all basic nursing skills. SHH did not have a library or computer lab for its students.

48. SHH did not provide faculty-supervised clinical rotations in all five required subject areas of LVN nursing.

49. During the effective period of Governor Abbott's disaster declaration allowing students to exceed the 50 percent limit on clinical education satisfied by simulation exercises, no approved Texas program failed to provide some amount of in-person clinical rotation hours for their students. Students in approved Texas LVN programs performed a minimum of 176 in-person clinical hours in 2020, 96 hours in 2021, and 176 hours in 2022.

## VII. CONCLUSIONS OF LAW

1. The Board has jurisdiction over the licensing and discipline of nurses. Tex. Occ. Code ch. 301.

2. SOAH has jurisdiction over contested cases referred by the Board, including the authority to issue a proposal for decision with findings of fact and conclusions of law. Tex. Occ. Code § 301.459; Tex. Gov't Code ch. 2003.

3.   Respondent received adequate and proper notice of the hearing on the merits. Tex. Occ. Code § 301.454; Tex. Gov't Code §§ 2001.051-.052.

4.   Staff had the burden of proving that disciplinary action against Respondent's license was warranted, and Respondent had the burden of establishing any mitigating evidence. 1 Tex. Admin. Code § 155.427; *Scally v. Tex. St. Bd. of Med. Exam'rs*, 351 S.W.3d 434, 446-48 (Tex. App.—Austin 2011, pet. denied).

5.   To determine whether denial of the Renewal is warranted, Staff had the burden of identifying the legal standards alleged to apply and to produce evidence that they were not met, and Respondent had the ultimate burden of persuasion to show her qualifications for the privilege of continuing nursing practice in this state. Tex. Gov't Code §§ 2001.051-.052; 1 Tex. Admin. Code § 155.427; *Scally*, 351 S.W.3d at 446-48.

6.   The standard of proof is by a preponderance of the evidence. *Granek v. Tex. St. Bd. of Med. Exam'rs*, 172 S.W.3d 761, 777 (Tex. App.—Austin 2005, no pet.); *Sw. Pub. Servs. Co. v. Pub. Util. Comm'n of Tex.*, 962 S.W.2d 207, 213-14 (Tex. App.—Austin 1998, pet. denied).

7.   Based on the foregoing Findings of Fact and Conclusions of Law, Staff did not meet its burden of proof to show that Respondent committed fraud or deceit in procuring or attempting to procure a license or that she used a diploma that was fraudulently purchased, issued, counterfeited, or materially altered. Tex. Occ. Code § 301.452(b)(2), (5).

8.   Disciplinary action is not warranted based on the evidentiary record in this case.

9.   The SHH program was not approved by the Board, accredited by a national nursing accreditation agency the Board determined to have acceptable standards, or approved by the FBON and accepted by the Board. Tex. Occ. Code § 301.157(d).

10.  SHH did not meet Board standards for LVN programs with respect to pretesting, curriculum, instructional scope, and teaching aids. 22 Tex. Admin. Code §§ 214.8(d)(4), .9(a), (b)(2), (e), (g)(3), (h), .11(d)(6).

11.    SHH did not meet Board standards for LVN program faculty in terms of faculty qualifications, number of instructors, instructor-student ratios, and student evaluations. 22 Tex. Admin. Code §§ 214.7(c), (d)(2)(D), .10(f)-(h).

12.    SHH did not meet Board standards for facilities offered by LVN programs with respect to its simulation lab and lack of a library. 22 Tex. Admin. Code § 214.11(b), (d)(5), (e).

13.    Even given Governor Abbott's disaster declaration, SHH did not meet Board standards to offer adequate in-person clinical rotations supervised by program faculty. 22 Tex. Admin. Code §§ 214.9(e), .10(c), (g)-(h).

14.    Based on the foregoing Findings of Fact and Conclusions of Law, Staff produced evidence to show Respondent did not successfully complete an approved program of vocational nursing, and Respondent did not meet her burden of persuasion to show she was nonetheless qualified. Tex. Occ. Code §§ 301.157(d), .260; 22 Tex. Admin. Code § 217.5(a)(1).

15.    Based on the foregoing Findings of Fact and Conclusions of Law, Staff produced evidence to show Respondent did not achieve an education substantially equivalent to Texas standards, and Respondent did not meet her burden of persuasion to show she was nonetheless qualified. Tex. Occ. Code § 301.260; 22 Tex. Admin. Code § 217.5(a)(1)(B).

## VIII. RECOMMENDATION

The Board should uphold Staff's proposed denial of Respondent's Renewal application for her Texas License.

**Signed November 20, 2023.**

ALJ Signature:

_____
Pratibha J. Shenoy
Presiding Administrative Law Judge

# Appendix B

IN THE MATTER OF § BEFORE THE STATE OFFICE
EDITH OKECHUKWU OMIETIMI §
APPLICANT FOR LICENSURE §
RENEWAL OF VOCATIONAL NURSE § OF ADMINISTRATIVE HEARINGS
LICENSE NUMBER 1032052

## OPINION AND ORDER OF THE BOARD

TO: Edith Okechukwu Omietimi
c/o John Shepperd
Wilson Elser
919 Fannin St., Ste. 3300
Houston, TX 77010

Pratibha J. Shenoy
Administrative Law Judge
300 West 15th St.
Austin, Texas 78701

At the regularly scheduled public meeting on April 18, 2024, the Texas Board of Nursing (Board) considered the following items: the Proposal for Decision (PFD) regarding the above cited matter; Staff's recommendation to the Board regarding the PFD and order; and Respondent's recommendation to the Board regarding the PFD and order, if any.

The Board finds that after proper and timely notice was given, the above styled case was heard by an Administrative Law Judge (ALJ) who made and filed a PFD containing the ALJ's findings of facts and conclusions of law. The PFD was properly served on all parties and all parties were given an opportunity to file exceptions and replies as part of the record herein. Respondent filed exceptions on December 5, 2023. The ALJ issued a letter declining to modify the Proposal for Decision on January 11, 2024.

The Board, after review and due consideration of the PFD, Staff's recommendations, and the recommendations made by the Respondent, if any, adopts the Proposal for Decision including all findings of fact and conclusions of law of the ALJ contained in the PFD that support the Board's action. All proposed findings of fact and conclusions of law filed by any party not specifically adopted herein are hereby denied.

Recommendation for Action

Pursuant to Tex. Occ. Code. §301.459 (a-1), an Administrative Law Judge may make a recommendation regarding an appropriate action or sanction. The

Board, however, has the sole authority and discretion to determine the appropriate action or sanction.

The ALJ found, and the Board agrees, that the Respondent did not successfully complete an approved program of vocational nursing and did not achieve an education substantially equivalent to Texas standards. The ALJ recommends that the Board sustain its denial of Respondent's application for licensure renewal because the Respondent does not meet all licensure requirements. The Board agrees.

The Board has jurisdiction to determine whether the credentials Respondent presented are sufficient to hold a Texas license.[7] Respondent's diploma was not and is not adequate for purposes of Texas licensure.[8]

The ALJ found, and the Board agrees, that the Respondent's program was not Board approved and could not lawfully issue a diploma to qualify Respondent for a Texas license.[9] A person may not practice nursing under a diploma, license or record that was issued unlawfully.[10] Respondent's education took place in Houston, Texas, despite the Respondent's educational program never applying to be an approved Texas LVN program.[11] Respondent's educational program was not nationally accredited.[12] Further, the Board agrees with the ALJ that it is starkly obvious that the Florida Board of Nursing approved Sacred Heart program is not what Respondent's Houston-based educational program provided.[13] As neither the Texas Board of Nursing nor the Florida Board of Nursing approved this specific nursing educational program, Respondent did not attend an approved school of nursing valid to renew or retain a license to practice nursing.

The ALJ further found, and the Board agrees, that Respondent's education was not substantially equivalent to a Board-approved LVN program.[14] Substantially equivalent education to a Texas LVN program is a requirement for licensure in Texas. Respondent's program fell short of Texas standards for an LVN program in that the program had deficient curriculum; was inadequately staffed with faculty of unproven competence; provided substandard simulation facilities and no library or computer lab; and did not include supervised clinical rotations that were at least partially in-person and covered all required subject areas.[15]

In sum, the Board finds that that Respondent did not successfully complete an

---

[7] Proposal for Decision, page 30.
[8] Proposal for Decision, page 31.
[9] Proposal for Decision, page 5, Finding of Fact 36-39, page 41.
[10] *See* Tex. Occ. Code § 301.451.
[11] Proposal for Decision, page 32.
[12] Proposal for Decision, page 32.
[13] Proposal for Decision, page 33, Conclusion of Law 9, page 43.
[14] Proposal for Decision, page 5.
[15] Proposal for Decision, pages 34-45, Findings of Fact 40-49, pages 41-42. Conclusion of Law 10-13, page 44.

approved program of vocational nursing.[16] The Board further finds that Respondent did not achieve an education substantially equivalent to Texas standards.[17] Based on the foregoing, the Board finds that the Respondent does not meet licensure requirements and is ineligible to renew her Texas LVN license.[18] The Board finds that a risk to public safety exists based on the practice of nursing by an individual who has not completed an adequate educational program.[19]

The Board, after considering the findings of fact and conclusions of law promulgated by the ALJ in this case, agrees with the ALJ that the Respondent's Application for Licensure R e n e w a l should be denied.

IT IS, THEREFORE, ORDERED THAT the Application for Licensure Renewal filed by EDITH OKECHUKWU OMIETIMI, is hereby, DENIED.

IT IS FURTHER ORDERED that this Order SHALL be applicable to Respondent's multi-state privileges, if any, to practice nursing in the State of Texas.

Entered this 18th day of April, 2024.

TEXAS BOARD OF NURSING

KRISTIN K. BENTON, DNP, RN
EXECUTIVE DIRECTOR FOR THE BOARD

Attachment: Proposal for Decision; 507-23-18180 (November 20, 2023)

---

[16] Proposal for Decision, Conclusion of Law 14, page 44.
[17] Proposal for Decision, Conclusion of Law 15, page 44.
[18] Proposal for Decision, page 1.
[19] See Proposal for Decision, page 36.

STATE OFFICE OF ADMINISTRATIVE HEARINGS RECEIVED ON 11/20/2023 11:40 AM

FILED
507-23-18180
11/20/2023 11:40 AM
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
April Bermea , CLERK

ACCEPTED
507-23-18180
11/20/2023 11:46:54 am
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
April Bermea , CLERK

# State Office of Administrative Hearings

### Kristofer S. Monson
### Chief Administrative Law Judge

November 20, 2023

John Vanderford, Texas Board of Nursing

**VIA EFILE TEXAS**

Edith Okechukwu Omietimi
c/o John Shepperd & Lina Al-Salim

**VIA EFILE TEXAS**

    **RE:   Docket Number 507-23-18180**
         *Texas Board of Nursing v. Edith Okechukwu Omietimi*

Dear Parties:

Please find attached a Proposal for Decision in this case.

Exceptions and replies may be filed by any party in accordance with 1 Texas Administrative Code section 155.507(b), a State Office of Administrative Hearings rule which may be found at www.soah.texas.gov.

CC: Service List

P.O. Box 13025 Austin, Texas 78711-3025 | 300 W. 15th Street Austin, Texas 78701
Phone: 512-475-4993 | www.soah.texas.gov

# BEFORE THE
# STATE OFFICE OF ADMINISTRATIVE HEARINGS

---

**TEXAS BOARD OF NURSING,**
**PETITIONER**
**v.**
**EDITH OKECHUKWU OMIETIMI,**
**RESPONDENT**

## TABLE OF CONTENTS

I.    Notice, Jurisdiction, and Procedural History ................................................ 2

II.   Background Facts and Overview of Issues ..................................................... 2

III.  Applicable Law .............................................................................................. 6

    A.    Burden of Proof. ................................................................................... 6

    B.    Substantive Law Applicable to Disciplinary Actions ........................... 8

    C.    Substantive Law Applicable to License Eligibility ............................... 9

        1.    "Approved" Nursing Programs ................................................... 9

        2.    Substantially Equivalent Education ........................................ 10

IV.  Evidence ........................................................................................... 11

    A.  Respondent's Testimony ............................................................... 12

    B.  Agent Lane's Testimony ............................................................... 17

    C.  Dr. Donnelly's Testimony ............................................................ 19

        1.  SHH's curriculum deficiencies .............................................. 20

        2.  SHH's faculty deficiencies ..................................................... 22

        3.  Shortcomings of SHH's facilities .......................................... 23

        4.  Inadequacy of SHH's clinical component ............................. 24

V.  Analysis ........................................................................................... 27

    A.  Respondent Did Not Commit Fraud or Deceit in Obtaining the
        License ........................................................................................ 27

    B.  SHH/Sacred Heart Was Not Approved by the Board ...................... 31

    C.  SHH Did Not Provide a Substantially Equivalent Education to a
        Board-Approved Program ........................................................... 34

    D.  Recommendation ......................................................................... 35

VI.  Findings of Fact ............................................................................... 36

VII.  Conclusions of Law .......................................................................... 42

VIII.  Recommendation .............................................................................. 44

# BEFORE THE
# STATE OFFICE OF ADMINISTRATIVE
# HEARINGS

---

**TEXAS BOARD OF NURSING,**
**PETITIONER**
**V.**
**EDITH OKECHUKWU OMIETIMI,**
**RESPONDENT**

## PROPOSAL FOR DECISION

This case involves both a disciplinary action and a license eligibility determination. The Texas Board of Nursing (Board) issued a Licensed Vocational Nurse (LVN) credential (License) to Edith Okechukwu Omietimi (Respondent) in March 2021. In April 2023, Respondent applied to renew the License (Renewal). The staff (Staff) of the Board seeks to revoke the License and deny the Renewal. The Administrative Law Judge (ALJ) finds Staff failed to demonstrate fraud on Respondent's part to prove its basis for License revocation as a disciplinary action. However, the ALJ recommends the Board uphold Staff's decision to deny the Renewal because Respondent does not meet all licensure requirements.

# I.  NOTICE, JURISDICTION, AND PROCEDURAL HISTORY

Matters of notice and jurisdiction were undisputed and are set out in the Findings of Fact and Conclusions of Law. On September 25, 2023, State Office of Administrative Hearings (SOAH) ALJ Pratibha J. Shenoy convened the hearing on the merits via Zoom videoconference. Deputy General Counsel John Vanderford represented Staff. Respondent appeared and was represented by attorneys John Shepperd and Lina Al-Salim. The record closed the next day, upon the filing of admitted exhibits.

# II.  BACKGROUND FACTS AND OVERVIEW OF ISSUES

In January 2023, the Federal Bureau of Investigation (FBI) and the federal Health and Human Services Commission-Office of Inspector General (HHSC-OIG) announced "Operation Nightingale," a law enforcement action against a fraudulent nursing diploma scheme. Around 7,600 individuals nationwide were identified as participants in a scheme to obtain fraudulent degrees that allowed them to sit for the National Council Licensing Examination (NCLEX) and, if they passed the NCLEX, to obtain licenses to practice nursing.[1] Along with at least 100 other Texas nurses, Respondent was identified as potentially involved in Operation Nightingale.[2]

The Operation Nightingale scheme overlapped with COVID-19 emergency declarations that changed requirements for clinical nursing education. In Texas,

---

[1] *See* https://www.justice.gov/usao-sdfl/pr/fraudulent-nursing-diploma-scheme-leads-federal-charges-against-25-defendants (last visited September 29, 2023).

[2] Respondent does not dispute her name came up in the FBI/HHSC-OIG investigation but denies any wrongdoing.

Governor Abbott issued a disaster declaration on March 21, 2020, allowing the Board to modify certain rules. Relevant to this case, the declaration noted that Board rules limit clinical learning to no more than 50 percent simulation activities, but that requirement would be modified to allow "students in their final year of a nursing education program to meet clinical learning objectives by exceeding the 50% limit on simulated...experiences."[3] The change was meant to "help senior nursing students enrolled in a program that has ceased direct care clinical learning experiences to graduate as planned and become a part of the nursing workforce during this unprecedented disaster when employers need 'all hands on deck.'"[4] The waiver expired September 1, 2022.[5]

In Florida, where the nursing schools involved in Operation Nightingale were based, the State Surgeon General issued an Emergency Order on March 21, 2020, suspending requirements for didactic and clinical programs.[6] The Emergency Order stated that programs may, "with the approval of the dean/program director/program chair/program coordinator, substitute supervised remote live videoconferencing for didactic hours and simulation for all supervised clinical instruction hours required by any statute or rule."[7] The Florida Emergency Order is relevant in this case because Respondent believed she was attending a satellite campus of an approved Florida school. She obtained an LVN-equivalent license

---

[3] Resp. Ex. 6.

[4] Resp. Ex. 6.

[5] Staff Ex. 20 at 7.

[6] Resp. Ex. 5.

[7] Resp. Ex. 5.

(called Licensed Practical Nurse, or LPN, in Florida) from the Florida Board of Nursing (FBON) in February 2021. She then applied for the License in Texas by endorsement based on her LPN license, receiving the License in March 2021. The Florida Emergency Order suspension ended June 26, 2021.[8]

This is a case of first impression.[9] And, as previously noted, this case is both a disciplinary action and a licensure eligibility determination.[10] To facilitate the discussion, the ALJ begins by summarizing the issues, legal standards, and burdens of proof, and previewing the findings and conclusions, before addressing each matter in detail.[11]

Staff makes three contentions in this case.[12] First, Staff argues Respondent participated in Operation Nightingale and obtained the License through fraudulent means by purchasing a fraudulent diploma. Commission of fraud or deceit in obtaining a license can subject a licensee to Board sanctions, as can use of a diploma that has been fraudulently issued, counterfeited, or altered.[13] Staff had the burden to prove its allegations by a preponderance of the evidence. The ALJ finds Staff did not

---

[8] Staff Ex. 13; *see also* Florida Dept. of Health website: News (floridahealthcovid19.gov) (last visited Oct. 20, 2023).

[9] Per Staff, this is the first Operation Nightingale case at SOAH to go to hearing. The Board's website states formal charges have been filed against over 100 nurses and disciplinary action—primarily via voluntary license surrender—has been taken against many others. *See* https://www.bon.texas.gov/Operation_Nightingale_Main.asp.html (last visited Oct. 20, 2023).

[10] *See Staff's Third Amended Formal Charges* (Formal Charges) filed Sept. 6, 2023 (Staff Ex. 3e).

[11] SOAH ALJs have decisional independence; the ALJ's framework in this case may not be appropriate for or adopted in other cases. *See* Tex. Gov't Code §§ 2003.022(d)(2), .041(c).

[12] Staff's Formal Charges list a single Charge which is broken into three parts here for ease of analysis.

[13] Tex. Occ. Code § 301.452(b)(2), (5).

show Respondent committed this alleged misconduct. Disciplinary action is thus not warranted on this factual record.

Staff's second and third allegations relate to Respondent's qualifications. An applicant for licensure by endorsement may demonstrate she is qualified by showing she graduated from a Texas-approved program or that she completed a program with substantially equivalent education standards to a Texas-approved program.[14]

In its second contention, Staff asserts Respondent's nursing program was unapproved. Staff had the burden of identifying the legal basis on which the program is alleged to be unapproved and of producing evidence the program failed to meet that legal standard. Respondent had the burden of persuasion to show she nonetheless is qualified. The ALJ finds Respondent's program was not approved and could not lawfully issue a diploma to qualify Respondent for a Texas license.

Staff's third contention is that Respondent's education is not substantially equivalent to Texas standards. Staff had the burden of identifying the law governing program standards and of producing evidence the program failed to meet the legal standard(s). Respondent had the burden of persuasion to show her qualifications despite Staff's evidence. The ALJ finds Respondent's education was not substantially equivalent to a Board-approved LVN program.

---

[14] Tex. Occ. Code § 301.260; 22 Tex. Admin. Code § 217.5(a)(1).

## III. APPLICABLE LAW

### A. BURDEN OF PROOF

The standard of proof is a preponderance of the evidence.[15] Who bears the burden of proof depends on the statute (here, the Nursing Practice Act (Act), found in chapter 301 of the Texas Occupations Code (Code)), the Board's rules, and documented agency policy.[16] The ALJ may also consider other factors, such as which party seeks affirmative relief and whether a party would be required to prove a negative.[17] Relevant here, the ALJ may weigh the parties' "relative access to and control over information pertinent to the merits of the case."[18]

A "professional license is a property right" of the licensee, but the right "has been created by statute and is subject to the state's power to impose conditions upon the granting or revocation of the license for the protection of society."[19] When it exercises enforcement authority against a licensee, the Board must follow the procedural due process safeguards of the federal and Texas constitutions, which protect "litigants in agency proceedings when the agency 'deprives an individual of life, liberty, or property based on resolution of contested factual issues concerning

---

[15] *Granek v. Tex. St. Bd. of Med. Exam'rs*, 172 S.W.3d 761, 777 (Tex. App.—Austin 2005, no pet.); *Sw. Pub. Servs. Co. v. Pub. Util. Comm'n of Tex.*, 962 S.W.2d 207, 213–14 (Tex. App.—Austin 1998, pet. denied).

[16] 1 Tex. Admin. Code § 155.427.

[17] 1 Tex. Admin. Code § 155.427(3)-(5).

[18] 1 Tex. Admin. Code § 155.427(2).

[19] *Scally v. Tex. St. Bd. of Med. Exam'rs*, 351 S.W.3d 434, 446 (Tex. App.—Austin 2011, pet. denied) (citations omitted).

that individual.'"[20] The process that is due is, "[a]t a minimum, notice and an opportunity to be heard at a meaningful time and in a meaningful manner" before "an impartial factfinder."[21]

Staff's first charge seeks disciplinary action (revocation), asserting Respondent committed fraud in obtaining the License. In exercising enforcement authority, Staff had the burden of proving the existence of facts justifying the sanction. Respondent had the burden to prove any mitigating factors.[22]

Staff's second allegation is that Respondent's program was unapproved, so it "could not lawfully issue [a diploma] valid to form the basis of eligibility for a Texas nursing license."[23] Its third allegation is that the program's content was not substantially equal to Texas standards. Meaningful notice to Respondent requires that she be made aware of how her education was allegedly unapproved or fell short. Staff is in the better position to specify the alleged deficits, given that the Board is responsible for determining and publishing the applicable standards. Therefore, Staff had the burden to identify the standards that apply and produce evidence they were not met. The ALJ references the Notice of Hearing[24] and Formal Charges for the standards Staff put into contention. Respondent—as the person seeking the

---

[20] *Scally*, 351 S.W.3d at 446–47 (citations omitted).

[21] *Scally*, 351 S.W.3d at 447-48 (citations omitted). *See also* Tex. Gov't Code § 2001.051 (addressing, in administrative hearing context, rights to a hearing after reasonable notice of not less than 10 days and to participate in the hearing).

[22] 1 Tex. Admin. Code § 155.427.

[23] Staff Ex. 3e at 9-10.

[24] Staff's *Fifth Amended Notice of Hearing* (Notice of Hearing) filed Sept. 6, 2023 (Staff Ex. 3e).

privilege of continued practice in this state—had the ultimate burden of persuasion to demonstrate she is qualified.

## B.    SUBSTANTIVE LAW APPLICABLE TO DISCIPLINARY ACTIONS

A person may not practice nursing in Texas without a Board-issued license.[25] It is a violation to commit "fraud or deceit in procuring or attempting to procure a license" or to use a license or diploma "that has been fraudulently purchased, issued, counterfeited, or materially altered."[26] Staff contends Respondent obtained the License "through fraudulent means by purchasing a fraudulent [diploma] from a fraudulent school"[27] and misled the Board into believing she completed an approved program. Staff did not specify a definition of fraud or deceit, and neither the Act nor Board rules appears to contain one. For the reasons explained in the Analysis section, the ALJ applies the common law definition of fraud.

When a nurse violates the Act or Board rules, the Board is required to impose a disciplinary sanction, which can range from remedial education to license revocation.[28] Because a basis for discipline was not established in this case, the sanction analysis is not addressed.[29]

---

[25] Tex. Occ. Code § 301.251(a).

[26] Tex. Occ. Code § 301.452(b)(2), (5).

[27] Staff Ex. 3e at 9.

[28] Tex. Occ. Code § 301.453; 22 Tex. Admin. Code § 213.33(e).

[29] If the facts establish a basis for sanction, the Board's Disciplinary Matrix and aggravating and mitigating factors must be analyzed. *See* 22 Tex. Admin. Code § 213.33.

## C.    SUBSTANTIVE LAW APPLICABLE TO LICENSE ELIGIBILITY

Respondent first obtained a license in Florida and then applied for the License by endorsement. A person licensed in another state may qualify for a temporary license by endorsement by submitting proof of initial licensing by examination and evidence that the person "possessed, at the time of initial licensing as a nurse, the other qualifications necessary at that time to have been eligible for licensing in this state."[30] A person who holds a temporary license may obtain a permanent license if she "verifies [her] academic and professional credentials" and "satisfies any other requirement established by statute."[31] By rule, the Board has specified that licensure by endorsement (whether temporary or permanent) requires proof of graduation from either "an approved Texas nursing education program" or a "program with substantially equivalent education standards[.]"[32]

### 1.    "Approved" Nursing Programs

A person may not be certified as a graduate of an approved nursing education program unless the program is (i) approved by the Board; (ii) accredited by a national nursing accreditation agency the Board has determined has acceptable standards; or (iii) approved by the state board of nursing of another state and the Board.[33]

---

[30] Tex. Occ. Code § 301.260(a).

[31] Tex. Occ. Code § 301.260(b).

[32] 22 Tex. Admin. Code § 217.5(a)(1).

[33] Tex. Occ. Code § 301.157(d).

To be approved by the Board to operate a Texas-based program, a vocational nursing education program must be licensed by the Texas Workforce Commission or the Texas Higher Education Coordinating Board, as applicable, and the program's proposal must be approved by the Board.[34] The Board has recognized certain national accreditation agencies as acceptable, as discussed in the Analysis section. If the governing entity of a program has vocational nursing programs in other jurisdictions (for example, a Florida-approved school seeks to operate an extension site in Texas), the program proposal must include evidence that the programs' pass rates for the NCLEX-PN[35] "are at least 80% for the current examination year…and that the nursing programs hold full approval from the state boards of nursing in the other states and are in good standing."[36] Staff alleges Respondent's program met none of these requirements and thus could not lawfully issue a diploma to certify that Respondent graduated from an approved nursing program.

## 2. Substantially Equivalent Education

An LVN program in another state may be deemed to have "substantially equivalent education standards" to a Texas program if:

(i) the program is approved by a state board of nursing or other governmental entity to offer a pre-licensure vocational/practical nursing program of study that awards a vocational/practical nursing certificate, diploma, or degree upon completion;

---

[34] 22 Tex. Admin. Code § 214.3(a)

[35] The NCLEX-PN is for vocational nurses; the NCLEX-RN is for registered nurses (RN).

[36] 22 Tex. Admin. Code § 214.3(a)(2)(B).

(ii)    the program's nursing courses include didactic and supervised clinical learning experiences in medical-surgical, maternal/child health, pediatrics, geriatrics, and mental health nursing that teach students to use a systematic approach to clinical decision-making and safe patient care across the life span; and

(iii)    the program includes support courses providing a sound foundation for nursing education for the level of preparation.[37]

Staff's Formal Charges identified the following shortcomings in Respondent's nursing education: inadequate curriculum[38] and teaching aids;[39] no pretesting for aptitude for the nursing profession;[40] insufficient instructors with proven qualifications;[41] substandard simulation facilities;[42] no library;[43] and absence of clinical instruction with live patients to develop and assess clinical competencies.[44]

## IV. EVIDENCE

Staff called Respondent as a witness and presented testimony from FBI Special Agent Matthew Lane and Nursing Consultant for Education to the Board

---

[37] 22 Tex. Admin. Code § 217.5(a)(1)(B). Prior to 2022, these requirements were found at 22 Tex. Admin. Code § 217.2. *See* 47 Tex. Reg. 6581-82 (Oct. 7, 2022).

[38] 22 Tex. Admin. Code § 214.9.

[39] 22 Tex. Admin. Code § 214.11(d)(6).

[40] 22 Tex. Admin. Code § 214.8(d)(4).

[41] 22 Tex. Admin. Code §§ 214.7(c)-(d), .10(g)-(h).

[42] 22 Tex. Admin. Code § 214.11(b), (d)(5).

[43] 22 Tex. Admin. Code § 214.11(e).

[44] 22 Tex. Admin. Code §§ 214.9-.10.

Lisa Donnelly, DNP, MA, RN,[45] who was accepted as an expert on nursing education standards. Respondent also testified on her own behalf. The ALJ admitted 25 exhibits for Staff[46] and six for Respondent.[47]

## A.    RESPONDENT'S TESTIMONY

Respondent is a native of Nigeria and immigrated to the United States in 2018 with her three younger children to join her two older children who were studying at American colleges in the Houston area. Respondent's husband is a civil engineer for Chevron Nigeria. Although she has a college degree from Nigeria in plant science and biotechnology, Respondent testified she wanted to pursue a career where she could express her empathetic nature. She had cared for her elderly parents and parents-in-law and wanted to help others in need. Respondent heard from a friend about a Certified Nursing Assistant (CNA) program at Faith Health Institute in Houston and completed a 10-week program to obtain a CNA certificate. She then completed a 10-week program to secure a certificate in medication administration, also from Faith Health Institute.

In 2019, Respondent began looking for a nursing school. She identified several options but ruled out those that had waitlists, offered only online instruction, were incompatible with her need to care for her younger children, or were too far from her home in Katy, Texas. A supervisor at work mentioned Sacred Heart International

---

[45] Staff Exhibit 23 contains Dr. Donnelly's *curriculum vitae*. She is not a medical doctor.

[46] Staff Exhibits 1-3, 3a-3e, 4-8, 12-21, 22 (corrected) and 23 were admitted.

[47] Respondent's Exhibits 1-6 were admitted.

and Respondent liked the in-person instruction it offered. Respondent searched online and saw a website for a school of nursing by that name in Florida; she believed she was attending a satellite campus in Texas. For clarity, "Sacred Heart" will be used here to refer to Sacred Heart International Institute, Inc., an FBON-approved nursing school located in Deerfield Beach, Florida. The Houston-based program Respondent attended will be referred to as Sacred Heart Houston (SHH).

SHH required Respondent to submit an essay explaining why she wanted to be a nurse. She was admitted and said she paid a $5,000 deposit, followed by monthly installments of $1,000 for the next 11 months. Orientation began in October 2019 and classes started the next month. Classes met from 9:00 a.m. to 2:00 p.m. on Mondays, Wednesdays, and Fridays, and tests were given every Thursday. The sole instructor was Serge Jean, RN. Mr. Jean used the "Remind" app to communicate with students. Respondent said Mr. Jean used Remind to send PowerPoint presentations to students as well as links to instructional videos, some on YouTube. No textbooks were required, though Mr. Jean provided a list of recommended books. Respondent bought two textbooks for her own use.

According to Respondent, the first quarter included an introduction to computers, medical terminology, and anatomy and physiology. A unit on nursing fundamentals began in the first quarter and continued through the second quarter due to the number of topics covered. Respondent said they learned about ethics, patient rights, and pre- and post-procedure care, among other topics. Students took a final exam at the end of each quarter and could not proceed to the next quarter

without a passing grade. The second quarter began in January 2020 and included a class on critical thinking and a medical-surgical nursing unit.

Around 40 students were in the program. Didactic classes were held in a lecture hall that could hold 50 people and clinical components were taught in a simulation room that could accommodate five students at a time. The simulation room included several mannequins, medication carts, and two beds Respondent said resembled those used in nursing homes. Simulation exercises included using a Pyxis drug dispensing device, measuring and administering medications, and positioning patients. Respondent said the mannequins could make crying sounds.

Near the end of the second quarter, before Spring Break in March, Mr. Jean circulated a list of nursing facilities for clinical rotations. Respondent chose a nursing home near her house. Then, during Spring Break, schools and businesses began closing or moving operations online due to COVID-19.

Respondent was questioned about whether she knew or had reason to suspect SHH was in fact "Jean's NCLEX Review," an unregulated program that was not approved in either Texas or Florida. She acknowledged receiving a letter from Mr. Jean in March 2020 that stated, "Jean's NCLEX is monitoring closely the development of covid-19[.]"[48] She received a second letter on April 20, 2020, stating, "At Jean's NCLEX Review, we know this is an extremely challenging time for everyone" and, "During the past few weeks, Jean's NCLEX Review has made the health and safety of our students, faculty, staff, and extended community…our

---

[48] Staff Ex. 18. The letter is undated but states, "there will be no classes this week (March 16-22)" for Spring Break.

top priority."[49] The letter explained that classes via Zoom videoconference would, "during this time of uncertainty, [enable] Jean's NCLEX Review…to continue helping students…navigate a way forward" to a career in nursing.[50]

At the time, the references to Jean's NCLEX Review did not strike her as odd, Respondent said, because almost all the other documentation she received referenced Sacred Heart. It also did not strike Respondent as unusual that SHH shifted all instruction online, because her children's schools were fully online.

Respondent completed the SHH program in October 2020 and took and passed the NCLEX-PN a few months later. SHH advised students to apply first to the FBON for an LPN license because Sacred Heart was a Florida-based school. That made sense, Respondent said, because she believed she was attending a Texas satellite campus of Sacred Heart. Respondent got her LPN in February 2021. In March 2021, she applied to the Board for a license by endorsement and obtained the License. Respondent said she typed in "Sacred Heart" for her school on the online Texas application and it auto-populated with Sacred Heart's Florida address.[51]

Wanting to continue her education, Respondent next looked at RN programs. Sacred Heart/SHH offered a one-year "bridge" program to help LVNs achieve an RN degree. She started the classes, but after a couple of months students were told the FBON determined the program did not meet requirements. The students were

---

[49] Staff Ex. 19.

[50] Staff Ex. 19.

[51] Staff Ex. 4.

transferred to "Techni-Pro," a separate program based in Florida.[52] Techni-Pro was fully online, though Respondent traveled twice to Florida for clinical rotations. Respondent completed the Techni-Pro program and took the NCLEX-RN exam in January 2023. At that time, news had just emerged about Operation Nightingale and Respondent was under a lot of stress worrying about her degrees. She said the strain affected her performance and she did not pass the NCLEX-RN. Despite the information coming to light about Sacred Heart, Respondent believed she had completed a legitimate course of study to qualify for the License and filed the Renewal application in April 2023. She has since enrolled in a different program and expects to graduate in 2026 with a bachelor's degree in nursing.

Respondent testified she never intentionally misrepresented her education or experience and did not try to fraudulently obtain any license. She believed she was doing everything right and securing genuine diplomas. If she knew in 2019 what she knows now about Sacred Heart and SHH, Respondent "never" would have attended. Respondent noted that since she obtained the License, she has worked part-time as an LVN at various facilities. She has changed jobs a few times but has been steadily employed and has never had any complaints against her.[53] Currently, she works at Heritage, a home health agency. Respondent said her supervisors know of this proceeding and that she was identified in Operation Nightingale, but they continue to employ her. She added that her Florida LPN license is still valid.

---

[52] It is unknown if Techni-Pro was alleged to be involved in Operation Nightingale. However, it is irrelevant to the present inquiry regarding Respondent's LVN education and License.

[53] Respondent's résumé is contained in Respondent Exhibit 4.

## B.    AGENT LANE'S TESTIMONY

Agent Lane is stationed at the FBI's Miami office. He testified that the FBI's Baltimore office received a tip about a local business selling nursing diplomas. Undercover agents purchased diplomas and exposed an alleged conspiracy between private businesses acting as recruiters, primarily in New Jersey, New York, and Texas, and the owners of Florida nursing schools. The recruiters found aspiring nurses and offered instruction geared to passing the NCLEX, and the nursing school owners issued false diplomas and transcripts for the students. Agent Lane explained Operation Nightingale ran a gamut, ranging from individuals who simply exchanged money for a nursing diploma, to those who received minimal instruction, to those who completed more robust programs that included clinical components.

The FBI executed a search warrant at the Sacred Heart premises in Florida and seized documents from Charles Etienne, the school's owner. Agent Lane said Sacred Heart was licensed only in Florida and only to provide on-campus instruction. According to Agent Lane, Mr. Etienne kept records of legitimate students and sent annual graduation lists to the FBON. Though Agent Lane declined to comment on the condition of the records, he testified Mr. Etienne "voluntarily cooperated" and participated in a "collaborative process" with the United States District Attorney's office to review his records and prepare affidavits listing students who were not on graduation lists and therefore—according to Mr. Etienne—were not legitimate students.[54]

---

[54] Staff offered three versions of Mr. Etienne's affidavits as exhibits, none of which was admitted. Because this is a case of first impression, the ALJ documents here the exhibits offered and excluded.

Staff Exhibit 9, submitted with an FBI business records affidavit, contains Mr. Etienne's March 7, 2022 affidavit (March Affidavit), stating he "issued Sacred Heart transcripts and diplomas to 587 individuals listed in Attachment B,

Agent Lane agreed he has not investigated Respondent's case and said he is not contending she committed fraud. He testified that Mr. Etienne pleaded guilty to conspiracy to commit mail fraud and wire fraud and is awaiting sentencing. Agent Lane added that, about a week before the hearing in this case, Mr. Jean and his wife, Ludnie Jean, pleaded guilty to conspiracy to commit wire fraud.

---

who did not receive instruction from Sacred Heart and did not receive the clinical training required to obtain a practical nursing transcript and diploma." Attachment A to the March Affidavit lists 35 students who attended Sacred Heart's Florida-based, on-campus program. All names on Attachments A and B are redacted except for Respondent's name on Attachment B. Also included is a letter on FBI letterhead addressed to Members of the National Council of State Boards of Nursing, forwarding the March Affidavit as well as documents generated by owners of other schools identified in Operation Nightingale. The letter encourages "State Boards of Nursing…to use this information as needed to conduct their own investigations and determine what actions to pursue[.]"

Staff Exhibit 10 is a business records affidavit from Mr. Etienne stating, "Pursuant to a criminal investigation conducted by agents with [HHSC-OIG and the FBI and in] cooperation with these federal agencies, I reviewed various student files of individuals who sought nursing credentials…from Sacred Heart." Based on that review, the affidavit states that Mr. Etienne "ascertain[ed] those individuals who were issued illegitimate degrees by Sacred Heart" and prepared "an affidavit attested to…on March 7, 2022." The student files reviewed are asserted to be "records of regularly conducted business activity" of Sacred Heart, kept by Mr. Etienne in the regular course of business. Although it seems to reference the March Affidavit, no documents are attached to Exhibit 10.

Staff Exhibit 11 is an April 3, 2023 affidavit (April Affidavit) from Mr. Etienne. It states that Mr. Etienne prepared the March Affidavit and its Attachments while represented by counsel and gave the testimony freely; he was the owner and sole custodian of records for Sacred Heart and any student files that existed would be in his possession; and, after a diligent search, he prepared Attachments A and B and believes them to be accurate.

Staff offered Exhibits 9-11 as business records of the FBI, negative business records of Sacred Heart, and/or statements against interest. Further, if the exhibits were deemed inadmissible under the Texas Rules of Evidence (which, as applied in a nonjury civil case in a district court, govern SOAH proceedings per 1 Texas Administrative Code § 155.429(a)(1)), Staff petitioned that an exception should be made pursuant to section 2001.081 of the Administrative Procedure Act. Tex. Gov't Code § 2001.081. This provision allows otherwise inadmissible evidence to be admitted if it is necessary to ascertain facts not reasonably susceptible of proof under the Texas Rules of Evidence, not precluded by statute, and of a type "on which a reasonably prudent person commonly relies in the conduct of the person's affairs." *Id.* Staff noted that Messrs. Etienne and Jean are outside the Board's subpoena power; per Agent Lane, both are in federal custody and will not be released to testify in civil proceedings such as this.

The ALJ sustained Respondent's hearsay objections to Staff Exhibits 9-11, finding they were offered for the truth of the matters asserted therein, namely that Respondent participated in a fraudulent scheme and was issued an illegitimate degree by Sacred Heart. The March and April Affidavits were prepared in anticipation of litigation; compiling lists of legitimate and illegitimate students is not a regularly conducted business activity of a school of nursing. The FBI provided the affidavits to state boards of nursing to use in conducting their own investigations, and the documents are not conclusive evidence of wrongdoing. Furthermore, the facts sought to be ascertained by these exhibits are reasonably susceptible of proof under evidence that is admissible and was admitted, as discussed in the Analysis section. Therefore, Staff Exhibits 9-11 were not admitted.

## C. DR. DONNELLY'S TESTIMONY

Dr. Donnelly holds associate and master's degrees in nursing, bachelor's and master's degrees in English, and a doctorate in nursing practice. She worked from 1996 to 2011 as a nurse in various hospital settings, including the emergency room, medical-surgical floor, and post-anesthesia care. From 2007 to 2020, she was also a clinical instructor for LVN students, an educator in a simulation laboratory, and an instructor for didactic and clinical LVN and RN students at community colleges and a public university. In 2021, she joined the Board as a consultant. Among other duties, she surveys Texas nursing programs to evaluate their compliance with applicable law, reviews new program proposals and curriculum changes, and makes recommendations to the Board regarding nursing education matters.

Dr. Donnelly provided evidence (through live testimony and her expert report) about Board records of approved programs. That testimony was uncontested and is incorporated in the Analysis section.

Dr. Donnelly also provided evidence regarding Staff's allegation that Respondent's education fell short didactically and clinically. Based on the deficiencies she identified, Dr. Donnelly opined that SHH did not meet minimum standards for Texas LVN programs and Respondent could not claim she received a substantially equivalent education. The areas identified in the Notice of Hearing and Formal Charges and addressed by Dr. Donnelly were the SHH curriculum (including pretesting and educational materials used), faculty, facilities, and clinical

component.[55] She evaluated the documentation available for SHH, including a curriculum outline, syllabus, videos of some class sessions, and Respondent's deposition.[56] Dr. Donnelly distinguished the SHH materials from the FBON-approved program outline for Sacred Heart, which is also in evidence.[57] No party claimed the Sacred Heart program outline was followed by SHH, and it is only discussed in the Analysis section, solely for purposes of contrasting it with SHH.

## 1. SHH's curriculum deficiencies

Texas LVN programs are required to pretest students to assess reading comprehension and mathematical ability.[58] Dr. Donnelly said no pretesting was done other than the essay Respondent wrote stating why she wanted to be a nurse.[59]

LVN nursing education must include both didactic and clinical instruction in five subject areas: medical-surgical, maternal/child health, pediatrics, geriatrics, and mental health nursing.[60] Instruction must be provided in "biological, physical, social, behavioral, and nursing sciences, including body structure and function,

---

[55] The discussion in this section incorporates both Dr. Donnelly's live testimony and her expert report.

[56] Respondent said that once SHH moved its instruction online, she recorded a few classes for her own reference. The recordings were provided to Staff and Dr. Donnelly stated she reviewed them. The videos, deposition, and other underlying documents reviewed by Dr. Donnelly are not in the record.

[57] Staff Ex. 12.

[58] 22 Tex. Admin. Code § 214.8(d)(4). Dr. Donnelly's testimony and Staff's Formal Charges referred to pretesting for "aptitude for the nursing profession," though the rule refers generically to reading and mathematical ability. Nonetheless, there is no evidence SHH conducted pretesting.

[59] Staff Ex. 20 at 5-6.

[60] 22 Tex. Admin. Code § 217.5(a)(1)(B) (addressing licensure by endorsement). Substantially the same list is in the Board's general rule on vocational programs of study. *See* 22 Tex. Admin. Code § 214.9(e)(1)-(5).

microbiology, pharmacology, nutrition, signs of emotional health, human growth and development, vocational nursing scope of practice, and nursing skills."[61]

Dr. Donnelly noted that SHH had a single syllabus for all courses, and the available documents do not show that instruction was provided in all five mandated subjects. The curriculum document has columns for course numbers and names, clock hours, and credit hours, but no totals are documented, and the number of hours required for graduation is not stated.[62]

A Board-approved LVN curriculum must include written clinical objectives and outcome measures.[63] None were evident in Dr. Donnelly's review, and "the skills checklists provided is a blank 'LPN Competency/Skills Checklist' from 'West Virginia Nursing Network, LLC.'"[64] Programs are required to provide teaching aids that "meet the objectives/outcomes of the program."[65] However, no textbooks were required, and Mr. Jean used "YouTube videos as teaching aids…and PowerPoint lessons copyrighted in 2014."[66] Per Dr. Donnelly, "use of expert-authored textbooks in any nursing program is regarded as a fundamental requirement" for students to understand the scientific rationale for techniques and interventions.[67]

---

[61] 22 Tex. Admin. Code § 214.9(b)(2).

[62] Staff Ex. 20 at 4-5.

[63] 22 Tex. Admin. Code § 214.9(g)(3), (h).

[64] Staff Ex. 20 at 4.

[65] 22 Tex. Admin. Code § 214.11(d)(6).

[66] Staff Ex. 20 at 7.

[67] Staff Ex. 20 at 6.

## 2.  SHH's faculty deficiencies

LVN programs must employ "sufficient faculty members with educational preparation and expertise necessary to enable the students to meet the program goals."[68] Faculty must show "evidence of teaching abilities and maintaining current knowledge, clinical expertise, and safety in the subject areas of teaching responsibility."[69]

Dr. Donnelly said evidence of Mr. Jean's qualifications was limited, at best, and his competence as an instructor was unknown. She doubted a single instructor could be expert enough to adequately teach all components of a nursing program, especially while also grading exams, mentoring students, supervising simulations and clinical rotations, and maintaining up-to-date knowledge and clinical expertise.[70] Even if Mr. Jean had the expertise to deliver all the lectures in all of the subject areas, the ratio would violate Board rules setting limits on the number of students for whom a faculty member may be a clinical preceptor, instructor, or supervisor, which varies from ten to 24 students based on the circumstances.[71]

In addition, faculty are responsible for formative and summative evaluations and for clinical practice evaluations to ensure students meet course objectives and

---

[68] 22 Tex. Admin. Code § 214.7(c)

[69] 22 Tex. Admin. Code § 214.7(d)(2)(D).

[70] Staff Ex. 20 at 3.

[71] 22 Texas Admin. Code §§ 214.7(c), .10(g)-(h); *see also* Staff Ex. 20 at 3-4.

demonstrate required skills.[72] Dr. Donnelly found no evidence that evaluations were done.[73]

### 3. Shortcomings of SHH's facilities

The skills laboratory of an LVN program must "accommodate the maximum number of students allowed for the program" and be "appropriately equipped" so that "students can receive instruction and demonstrate all basic nursing skills."[74] Dr. Donnelly said there would ordinarily be multiple simulation rooms for an LVN program, and each room would have the same equipment a nurse would encounter in a hospital room, such as IV poles and pumps, privacy curtains, a sink to practice routine handwashing, a crash cart, and multiple beds and mannequins. Mannequins should be high-fidelity, meaning they can talk and blink, and students can draw blood, start an IV, defibrillate the mannequin, insert a chest tube, listen for heart and bowel sounds, and more. Programs should have a "library [and] departmental holdings" that are "current, use contemporary technology appropriate for the level of the curriculum, and [are] sufficient for the size of the student body and the needs of the faculty."[75]

Dr. Donnelly said the five-person capacity of the SHH simulation room was lower than any she has encountered at an approved program, particularly given that there were 40 students in Respondent's class. The room lacked a sink, crash cart,

---

[72] 22 Tex. Admin. Code § 214.10(f).

[73] Staff Ex. 20 at 5.

[74] 22 Tex. Admin. Code § 214.11(b).

[75] 22 Tex. Admin. Code § 214.11(e).

and other equipment. The mannequins Respondent described appeared to be moderate fidelity at best. In addition, simulation labs usually have debriefing rooms where students can receive feedback from instructors, but SHH did not. Dr. Donnelly added that SHH had no computer lab or library for students.[76]

### 4.    Inadequacy of SHH's clinical component

Approved LVN programs in Texas must provide clinical experience in all five required subject areas.[77] Clinical rotations must be selected and planned by faculty and supervised by faculty or approved clinical preceptors.[78]

Dr. Donnelly testified that passing the NCLEX shows a student's knowledge, but not her ability to apply that information to a practical situation. In Dr. Donnelly's opinion, simulations have a valuable role in nursing education because they are pre-programmed by the instructor, predictable, and a safe way for students to make mistakes that can be reviewed and corrected without real-life consequences. However, she stressed, simulations can only augment the clinical program, not substitute for a clinical rotation.

Among other things, Dr. Donnelly noted that clinical rotations give students perspective on the types of patients they may encounter. Patients can vary tremendously in their backgrounds, quirks, physical conditions, acuity of illnesses,

---

[76] Staff Ex. 20 at 6-7.

[77] 22 Tex. Admin. Code § 214.9(e).

[78] 22 Tex. Admin. Code § 214.10(c), (g)-(h).

and other attributes. Two patients diagnosed with the same condition will not respond in the same way. Some may have skin integrity issues or limb problems that pose special challenges for positioning and treating them. Patients' families are another variable because they may need or want to participate in treatment decisions. Nurses must be able to interact with patients, families, and other members of the health care team, and sort and prioritize patient needs. Dr. Donnelly said some "gross motor skills" are only acquired through hands-on practice, including spiking a bag of saline, using syringes, removing pills from packaging, using a stethoscope, and feeling for a pulse.

Although Respondent's clinical rotations were canceled due to COVID-19, Dr. Donnelly denied that Texas nursing programs were allowed to fully substitute simulations for clinical experience during the period of Governor Abbott's disaster declaration. The declaration allowed simulation to exceed 50 percent of clinical hours, but simulation could not replace all clinical hours.[79] She explained that the Board conducts a yearly survey of all approved Texas nursing programs and gathers data on classroom and clinical hours.[80] Based on the survey, Dr. Donnelly knows of no legitimate program in Texas that did not provide in-person clinical rotations for its students, even during COVID-19. Some programs front-loaded clinical practice; others prolonged the course of study to allow students to do clinical rotations after COVID restrictions eased. Still others continued their pre-COVID clinical components because their partner facilities continued to allow student rotations. Averaged across all approved Texas LVN programs, students performed a minimum

---

[79] Dr. Donnelly did not indicate whether there was an upper limit on the number or percentage of simulation hours.

[80] Staff Ex. 14.

of 255 hands-on clinical hours in 2019, 176 hours in 2020, 96 hours in 2021, and 176 hours in 2022.[81] Maximum numbers of clinical hours performed in the same time frame ranged from 898 to 1408 hours.[82]

Further, Dr. Donnelly said she has never seen a legitimate program, whether in Texas or out-of-state, that waits several months to have LVN students start hands-on clinical practice. Most programs start within the first two weeks or so, because clinical settings are "where the learning really takes place." She noted that SHH had four to five months in which clinical rotations could have been conducted prior to COVID-19 restrictions taking effect.

Dr. Donnelly opined that Respondent's work experience as a CNA and medication aide cannot substitute for supervised clinical rotations. CNAs and medication aides function as resources. An LVN has a defined scope of practice to conduct focused patient surveys,[83] can make "life and death decisions," and has greater responsibility in an emergency. Respondent's work as an LVN since March 2021 also cannot offset the deficit, Dr. Donnelly said. She described faculty as playing a special role because they can identify signs or cues from patients that a student or even an experienced nurse may not recognize, and they can give feedback and insight on the choice of interventions. Thus, faculty-supervised clinical experience is crucial to developing the skills expected of a licensed LVN.

---

[81] Staff Ex. 20 at 8. As noted, Governor Abbott's waiver in Texas was effective March 21, 2020, to September 1, 2022.

[82] Staff Ex. 20 at 8.

[83] Dr. Donnelly said RNs have a broader scope of practice and are responsible for comprehensive patient surveys.

Even assuming simulations could suffice, Dr. Donnelly said the simulations Respondent did through SHH did not cover all five required subject areas to be deemed "substantially equivalent" to a Texas-approved program. SHH had no written clinical learning objectives and no evidence students received evaluations.

Dr. Donnelly concluded Respondent's training fell short of being substantially equivalent to a Texas-approved program in multiple ways. She noted nursing is historically one of the most trusted professions and the Board's duty is to protect the public by preventing unqualified nurses from practicing in Texas. In Dr. Donnelly's opinion, allowing Respondent to continue practicing poses "a grave risk to the public" because Respondent lacks supervised clinical training in skills such as using critical thinking, emergency response, and working with the health care team.

## V.    ANALYSIS

### A.    RESPONDENT DID NOT COMMIT FRAUD OR DECEIT IN OBTAINING THE LICENSE

The Act authorizes disciplinary action against a person who commits fraud or deceit in procuring or attempting to procure a license (Code section 301.452(b)(2)) or who uses a diploma that has been fraudulently issued, counterfeited, or materially altered (Code section 301.452(b)(5)).[84] The required mental state is a threshold issue. For Code section 301.452(b)(2), what *mens rea* must be proven to show a person fraudulently obtained a license? For Code section 301.452(b)(5), is it

---

[84] The provisions cited cover several types of wrongdoing. Given that Staff's Formal Charges focused on fraud (alleging Respondent obtained the License "through fraudulent means by purchasing a fraudulent [diploma] from a fraudulent school"), the ALJ follows suit.

necessary to show the person using the diploma knows it is fraudulent? Staff did not cite a definition of fraud and neither the Act nor Board rules appears to contain one.

Of note, the Texas Legislature recently amended the Medical Practice Act provision addressing false statements to add the word "knowingly" so that it is an offense if a person "*knowingly* makes a false statement...in the person's application for a license[.]"[85] The offense is a Class A misdemeanor "unless the actor's intent is to defraud or harm another, in which event the offense is a state jail felony."[86]

Without specific language in the Act or Board rules, a general definition is appropriate. Fraud is "multiform and as such has no single, all-encompassing definition."[87] Fraud is "defined as 'trickery or deceit,' 'intentional misrepresentation, concealment, or nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him,' or 'a false representation of a matter of fact...that deceives or is intended to deceive another so he shall act upon it to his legal injury.'"[88] Common law fraud requires that (1) a speaker made a representation; (2) the representation was material; (3) the representation was false; (4) when the representation was made, the speaker (A) knew the representation was false or (B) made the representation recklessly, as

---

[85] Tex. Occ. Code § 165.154(a)(1) (emphasis added). The provision previously did not specify *mens rea* and stated that a person "commits an offense if the person makes a false statement" in a license application. A violation constituted "tampering with a governmental record or perjury as prohibited by the Penal Code." Tex. Occ. Code § 165.154, *prior to* Sept. 1, 2023 amendment; *see* Acts 2023, 88th Leg., R.S., ch. 827 (H.B. 1998), § 12, eff. Sept. 1, 2023.

[86] Tex. Occ. Code § 165.154(b).

[87] 41 Tex. Jur. 3d, *Fraud and Deceit*, § 1 (Third Ed.).

[88] *In re E.P.*, 185 S.W.3d 908, 910 (Tex. App.—Austin 2006, no pet.) (citing *Webster's Third New International Dictionary* 904 (1986)).

a positive assertion, and without knowledge of its truth; (5) the speaker made the representation intending that another act on it; (6) the other person relied on the representation; and (7) the representation caused the other person injury.[89]

It is undisputed Respondent met the qualifications of passing the NCLEX-PN and the Board's nursing jurisprudence exam. Applying the common law definition of fraud, Staff needed to show Respondent knew of the falsity, or at a minimum was reckless with respect to the truth, of the representation in her applications that she had a valid diploma.

The ALJ finds Respondent sincerely wants to be a qualified nurse and took all of her programs of study seriously. Respondent credibly testified she believed SHH was legitimate and a satellite school of Sacred Heart. She was a recent immigrant who learned about both her schools (Faith Health Institute and SHH) via word-of-mouth from people she trusted, and she checked the website for Sacred Heart and saw it was a Florida-approved school. In the context of a pandemic and a rapid, nationwide shift to online operations for schools and businesses, it is reasonable Respondent believed her didactic and clinical education could take place fully online.[90] When she applied for a Florida LPN license and then a Texas license by endorsement, Respondent was following the procedure she was told and believed

---

[89] See "Fraud," O'Connor's Texas Causes of Action Ch. 12-A § 1 (2023 ed.) (collecting cases). Respondent (1) made a representation to the Board that she was qualified. The representation (2) was material to the license being approved and (3) is presumed false for purposes of this discussion. Respondent (5) made the representation with the intent that the Board rely on it and grant her a license. The Board (6) relied on the representation, and (7) suffered injury to its goal of protecting the public by only licensing qualified nurses. The only part of the definition that is in question for this discussion is (4) Respondent's mental state when she made the representation.

[90] As discussed below, Florida schools were permitted to conduct both didactic and clinical education fully online, further supporting the reasonableness of Respondent's beliefs.

to be proper. She credibly stated that when she typed in Sacred Heart as her school on the online application, a Florida address auto-populated. Respondent emphatically and persuasively said she "never" would have gone to SHH if she had known it was not approved in Texas or Florida and (allegedly) was part of a fraudulent scheme as indicated in Operation Nightingale.

Respondent also reasonably and sincerely believed she qualified to continue holding the License when she filed the Renewal in April 2023. Operation Nightingale had been announced a few months earlier and investigators alleged that some aspiring nurses exchanged cash for diplomas, but Respondent had completed a year-long program and passed the NCLEX-PN and Board nursing jurisprudence exam. A person wanting to buy a nursing diploma with the least possible effort would not be enrolled, as Respondent is, in her third nursing program with a scheduled graduation in 2026. Respondent has devoted years of her life and significant funds[91] to securing a valid license. She pointed out her LPN license remains valid in Florida, further supporting her belief that her Texas License was validly obtained and that submitting the Renewal application was not fraudulent.[92]

The evidence does not demonstrate Respondent was reckless as to the truth of the representations she made to the Board in obtaining her License or filing the Renewal. Staff did not establish fraud in violation of Code section 301.452(b)(2) or

---

[91] Respondent paid around $16,000 for her SHH program. It is unknown how much the bridge program through Techni-Pro cost, and Respondent is now in a bachelor's degree RN program.

[92] The status of the LPN license is the FBON's purview. The Board has jurisdiction to determine whether the credentials Respondent presented are sufficient to hold a Texas license.

(5). However, Respondent's diploma was and is not adequate for purposes of Texas licensure, as explained in the next sections.

## B.    SHH/SACRED HEART WAS NOT APPROVED BY THE BOARD

An applicant for licensure by endorsement may satisfy the Board's requirements by showing she graduated from an approved program. A program may be (i) approved by the Board; (ii) accredited by a national nursing accreditation agency the Board determines has acceptable standards; or (iii) approved by another state's board of nursing and accepted by the Board.[93] Dr. Donnelly determined Sacred Heart and SHH met none of these requirements, and the ALJ agrees.[94]

According to an affidavit from Sherri Sutton-Johnson, FBON Director of Nursing Education, the FBON approved Sacred Heart on November 7, 2013.[95] Neither party claims Sacred Heart, or any purported Sacred Heart extension site in Texas, existed prior to that date. The Board has approved 93 new Texas programs of nursing education (at all levels) since September 1, 2006, in addition to those in existence prior to that date.[96] On August 19, 2019, shortly before Respondent started the SHH program, there were 87 approved LVN education programs in Texas.[97] If SHH was authorized to operate in Texas, it would have obtained approval by the

---

[93] Tex. Occ. Code §§ 301.157(d), .252(a)(2).

[94] Staff Ex. 20 at 2. This section references parts of Dr. Donnelly's expert report that were not discussed in the Evidence section to avoid repetition, along with other uncontested evidence.

[95] Staff Ex. 13 at 2. Respondent did not object to the admissibility of this affidavit.

[96] Staff Ex. 21.

[97] Staff Ex. 22 (corrected).

Texas Workforce Commission or Texas Higher Education Coordinating Board and Board approval of a program proposal, and it would be on the list of approved LVN programs.[98] Dr. Donnelly determined SHH did not apply for approval in Texas and was not recognized as a Texas LVN education program.[99]

If an existing out-of-state school such as Sacred Heart seeks to operate an extension site in Texas, it must also submit a program proposal, and it must have an NCLEX pass rate of 80 percent. Dr. Donnelly said Sacred Heart never applied to the Board for a Texas extension site, and its NCLEX pass rates were between 26 and 36 percent for the 2020 to 2022 period.[100]

The Board has recognized accreditation agencies including the Commission on Collegiate Nursing Education (CCNE) and the Accreditation Commission for Education in Nursing (ACEN) as having acceptable standards.[101] Dr. Donnelly found neither Sacred Heart nor SHH had national accreditation from CCNE, ACEN, or any other Board-recognized accreditation agency.

The final possibility is that Respondent attended a program approved by another state's board and accepted by the Board. Ms. Sutton-Johnson's affidavit states the FBON approved Sacred Heart "as an in-person nursing education

---

[98] Staff Ex. 20 at 2-3.

[99] Staff Ex. 20 at 2.

[100] Staff Ex. 20 at 3.

[101] Staff Ex. 22 (corrected).

program" that "was not approved for online instruction."[102] However, the affidavit notes that from March 21, 2020, to June 26, 2021, the Florida State Surgeon General's Emergency Order permitted supervised remote live videoconferencing and simulation to substitute for all supervised clinical instruction hours required by statute or rule.

It appears that, while Sacred Heart was not initially FBON-approved to provide online instruction, it was allowed to conduct all didactic and clinical instruction online and via simulations during the effective period of the Emergency Order. It is possible a Sacred Heart student could have received a diploma in Florida after completing clinical instruction entirely via simulation. If such a student obtained a valid Florida LPN license, the Board might approve her licensure in Texas by endorsement. However, Respondent does not stand in this hypothetical student's shoes.

Though Respondent credibly testified she believed she was attending a satellite program of Sacred Heart, it is starkly obvious the program Sacred Heart was approved to provide in Florida is not what SHH provided. For example, the FBON-approved program outline for Sacred Heart lists 14 required textbooks and sets out 13 courses (with specified clock hours) covering all five required subject areas of LPN/LVN education.[103] Program objectives are detailed, and a program description is provided. The simulation lab at Sacred Heart is described as a simulated hospital unit equipped with six electric hospital beds, IV stands, over-bed

---

[102] Staff Ex. 13 at 2-3.

[103] Staff Ex. 12 at 2-3.

tables, privacy curtains, sinks, and an instructor's station, and offered newborn, pediatric, adult, and geriatric mannequins.[104] The program Respondent completed lacked most of these features and thus was not one that was approved by the FBON and (potentially) accepted by the Board.

Staff's evidence showed Respondent's program was not an approved nursing education program. Respondent did not meet her burden of persuasion to show she is nonetheless qualified.

## C. SHH DID NOT PROVIDE A SUBSTANTIALLY EQUIVALENT EDUCATION TO A BOARD-APPROVED PROGRAM

The starting point for an LVN program in another state to be deemed substantially equivalent to a Texas-approved program is that it includes "didactic and supervised clinical learning experiences in medical-surgical, maternal/child health, pediatrics, geriatrics, and mental health nursing that teach students to use a systematic approach to clinical decision-making and safe patient care across the life span" and "includes support courses providing a sound foundation for nursing education for the level of preparation."[105]

Dr. Donnelly has extensive experience as a nurse, an educator, and now a Board consultant responsible for evaluating nursing education programs. Her testimony regarding the ways in which SHH fell short of Texas standards for an LVN program was unchallenged. SHH had a deficient curriculum; was inadequately

---

[104] Staff Ex. 12 at 3.

[105] 22 Tex. Admin. Code § 217.5(a)(1)(A)(iii), (B)(iii); *see also* Tex. Occ. Code § 301.157(d-4).

staffed with faculty of unproven competence; provided substandard simulation facilities and no library or computer lab; and did not include supervised clinical rotations that were at least partially in-person and covered all required subject areas.

Staff's evidence showed Respondent did not complete a program of nursing education substantially equivalent to a Texas-approved program. Respondent did not meet her burden of persuasion to prove she is nonetheless qualified.

## D.   RECOMMENDATION

The FBI and HHSC-OIG assert that 7,600 individuals nationwide are implicated in the Operation Nightingale scheme to obtain nursing licenses via illegitimate diplomas and transcripts. As Agent Lane testified, the scheme ran a gamut from a pure exchange of cash for a diploma to programs that spanned several months and included didactic and clinical components. He indicated the alleged participants in Operation Nightingale who are relevant to this case— Messrs. Etienne and Jean—have pleaded guilty to federal charges of conspiracy to commit mail fraud and/or wire fraud and are awaiting sentencing. The ALJ does not comment on those prosecutions, which were still pending when the record closed in this case. Assuming, however, that SHH was part of a fraudulent scheme, the evidence indicates Respondent was an unwitting participant. She was not shown to have engaged in fraud, deceit, or misrepresentation, and Staff's requested disciplinary action (revocation) is not warranted on that basis.

The ALJ notes Dr. Donnelly's view that Respondent poses a "grave risk" to public safety if allowed to keep the License, but also recognizes there is no evidence

Respondent has had any safety or disciplinary issues at any of the LVN jobs she has held since her licensure over two years ago. The risk she poses is further belied by the decision of Respondent's employer to keep her on staff even after knowing of Staff's charges and that Respondent was alleged to have been involved in Operation Nightingale. The Board has the option of temporarily, and summarily, suspending or restricting a license based on evidence that a nurse's continued practice "would constitute a continuing and imminent threat to the public welfare."[106] Such a suspension can be implemented within a short timeframe and does not seem to have been pursued against Respondent.

Nonetheless, the Board is charged with regulating the practice of nursing in Texas with the aim of ensuring public safety. Respondent did not receive a didactic or clinical education in all required subject areas of LVN nursing practice, so she lacks the required foundation. Though Respondent has work experience as a CNA, medication aide, and LVN, Dr. Donnelly credibly pointed out that some more subtle signs of patient needs may not be understood, and the appropriate intervention may not be identified, without experience developed through faculty-supervised clinical rotations. In sum, Respondent does not meet Board standards for licensure. As an eligibility matter, the Board should uphold Staff's proposed denial of the Renewal.

## VI.  FINDINGS OF FACT

1.  Edith Okechukwu Omietimi (Respondent) received a Licensed Practical Nurse (LPN) credential from the Florida Board of Nursing (FBON) on February 12, 2021. She applied to the Texas Board of Nursing (Board) for a

---

[106] Tex. Occ. Code § 301.455.

Licensed Vocational Nurse (LVN, equivalent to LPN) license and was issued LVN License No. 1032052 (License) by the Board on March 22, 2021.

2. On April 7, 2023, Respondent submitted an application to renew the License (Renewal). The Staff of the Board proposed to revoke the License and to deny the Renewal, and Respondent timely requested a contested-case hearing before the State Office of Administrative Hearings (SOAH).

3. On September 6, 2023, Staff sent Respondent its Fifth Amended Notice of Hearing and Third Amended Formal Charges. Together, the Notice of Hearing and Formal Charges contained a statement of the time, place, and nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and either a short, plain statement of the factual matters asserted or an attachment that incorporated by reference the factual matters asserted in the complaint or petition filed with the state agency.

4. SOAH Administrative Law Judge Pratibha J. Shenoy convened the hearing on the merits via Zoom videoconference on September 25, 2023. Deputy General Counsel John Vanderford represented Staff. Respondent appeared and was represented by attorneys John Shepperd and Lina Al-Salim. The record closed the next day, upon the filing of admitted exhibits.

5. In January 2023, the Federal Bureau of Investigation (FBI) and the federal Health and Human Services Commission-Office of Inspector General (HHSC-OIG) announced "Operation Nightingale," a law enforcement action against participants in a fraudulent nursing diploma scheme. Around 7,600 individuals nationwide were identified as participants in a scheme to obtain fraudulent nursing degrees and transcripts that allowed them to sit for the National Council Licensing Examination (NCLEX) and, if they passed the NCLEX, to obtain licenses to practice nursing.

6. Operation Nightingale exposed an alleged conspiracy between private businesses acting as recruiters, primarily in New Jersey, New York, and Texas, and the owners of South Florida nursing schools. The recruiters found aspiring nurses and offered instruction that was geared to passing the NCLEX, and the nursing school owners issued false diplomas and transcripts for the students. The alleged scheme ran a gamut, ranging from those who simply exchanged money for a nursing diploma, to those who received minimal

instruction, to those who completed more robust programs that included clinical components.

7. Sacred Heart International Institute, Inc. (Sacred Heart) was located in Deerfield Beach, Florida, and was approved by the FBON on November 7, 2013, as an in-person nursing education program. It was not approved for online instruction. Charles Etienne was the owner of Sacred Heart.

8. Serge Jean was the sole instructor for what purported to be a Houston-based satellite campus of Sacred Heart (for convenience, referred to here as Sacred Heart Houston or SHH).

9. Respondent is a native of Nigeria and immigrated to the United States in 2018 with her three younger children to join her two older children who were studying at American colleges in the Houston area.

10. Respondent heard from a friend about a Certified Nursing Assistant (CNA) program at Faith Health Institute in Houston and completed a 10-week program to obtain a CNA certificate. She then completed a 10-week program to secure a certificate in medication administration, also from Faith Health Institute.

11. While working as a CNA and medication aide, Respondent researched nursing programs. She heard from a supervisor about Sacred Heart and enrolled at SHH in October 2019.

12. Respondent sincerely believed SHH was a legitimate nursing education program and an authorized satellite campus of Sacred Heart, a Florida-approved school.

13. Respondent attended in-person classes five hours a day, three days per week, at SHH from November 2019 to March 2020. She took in-person exams at SHH one day each week during that time. The classes included activities in a simulation lab.

14. Respondent was scheduled to do an in-person clinical rotation at a Houston nursing home through SHH in March 2020, after Spring Break.

15. In March 2020, Mr. Jean sent students a letter stating that he was monitoring the impact of COVID-19. The correspondence from Mr. Jean referenced "Jean's NCLEX Review," not SHH or Sacred Heart.

16. On March 21, 2020, Governor Abbott issued a disaster declaration in Texas that allowed the Board to modify certain rules. A Board rule limits clinical learning to no more than 50 percent simulation activities, but that requirement was modified to allow students in their final year of a nursing education program to exceed the 50 percent limit to enable them to graduate and join the workforce at a time when nurses were in great demand. The waiver expired on September 1, 2022.

17. On March 21, 2020, the Florida State Surgeon General issued an Emergency Order suspending requirements for didactic and clinical nursing programs. The Emergency Order allowed programs—with the approval of the appropriate administrator—to substitute supervised remote live videoconferencing for didactic hours and simulation for all supervised clinical instruction hours required by any statute or rule. The suspension ended June 26, 2021.

18. On April 20, 2020, Mr. Jean sent students a second letter, advising that all classes, including didactic and clinical instruction, would be conducted online via videoconference due to COVID-19 precautions. The correspondence from Mr. Jean referenced "Jean's NCLEX Review," not SHH or Sacred Heart.

19. Despite the references to Jean's NCLEX Review in Mr. Jean's letters, Respondent reasonably and sincerely believed her program was SHH, affiliated with Sacred Heart.

20. Due to the COVID-19 pandemic, schools and businesses nationwide engaged in a rapid shift to online operations, including Respondent's children's schools.

21. Respondent reasonably and sincerely believed her program was authorized to provide all instruction online.

22. Respondent completed the SHH program in October 2020 and took and passed the NCLEX-PN (for vocational or practical nurses) a few months later.

She then obtained her Florida LPN license and the Texas License by endorsement.

23. Respondent enrolled in a one-year bridge program offered by Sacred Heart/SHH to help LVNs achieve a registered nurse (RN) license. After a couple of months, students were told the FBON determined the program did not meet requirements. The students were transferred to Techni-Pro, a separate program based in Florida, and restarted the bridge curriculum.

24. Respondent completed the Techni-Pro bridge program and sat for the NCLEX-RN exam in January 2023.

25. Also in January 2023, Respondent was identified as potentially involved in Operation Nightingale, along with at least 100 other Texas nurses.

26. Respondent was under a lot of stress worrying about her degrees, which affected her performance. She did not pass the NCLEX-RN.

27. When Respondent submitted the Renewal application in April 2023, she continued to believe she had completed a legitimate one-year program and, because she passed the NCLEX-PN and Board nursing jurisprudence exam and held a valid Florida LPN license, that she met the requirements to hold the License.

28. Respondent has since enrolled in a different program and expects to graduate in 2026 with a bachelor's degree in nursing.

29. Mr. Etienne (the owner of Sacred Heart) has entered a guilty plea to federal charges of conspiracy to commit mail fraud and wire fraud and is awaiting sentencing.

30. In September 2023, Mr. Jean and his wife, Ludnie Jean, pleaded guilty to conspiracy to commit wire fraud and are awaiting sentencing.

31. Respondent paid around $16,000 for the SHH program and additional sums for the Techni-Pro bridge program and the bachelor's degree program in which she is currently enrolled. She has dedicated several years of her life and shown determination in pursuing a nursing degree.

32. Respondent genuinely believed she was enrolled in legitimate programs and properly obtaining a nursing education. She would not have attended SHH if she had known it was not approved in Texas or Florida and alleged to be part of Operation Nightingale.

33. There is no record evidence that Respondent committed fraud in the representations she made to the Board for her License application or the Renewal.

34. Since she obtained the License, Respondent has worked part-time as an LVN at various facilities. She has changed jobs a few times but has been steadily employed and has never had any complaints against her.

35. Currently, Respondent works at Heritage, a home health agency. Her supervisors are aware of this proceeding and that she was identified in Operation Nightingale, but they continue to employ her.

36. SHH was not approved by the Board to offer LVN instruction as a Texas-based program.

37. Sacred Heart was not approved by the Board to offer LVN instruction at a satellite or extension site in Texas.

38. Neither Sacred Heart nor SHH held accreditation from a national accreditation agency recognized by the Board as having acceptable standards.

39. The program of study that the FBON approved for Sacred Heart is not the same as what was provided to Respondent by SHH.

40. SHH did not pretest its students to assess reading comprehension and mathematical ability.

41. Respondent's education at SHH did not cover all five subject areas required by the Board for LVN nursing education to be considered substantially equivalent to a Texas-approved program (medical-surgical, maternal/child health, pediatrics, geriatrics, and mental health nursing).

42. SHH did not provide instruction as required by the Board in biological, physical, social, behavioral, and nursing sciences, including body structure and function, microbiology, pharmacology, nutrition, signs of emotional

health, human growth and development, vocational nursing scope of practice, and nursing skills.

43. The SHH curriculum did not include written clinical objectives and outcome measures, did not provide teaching aids that met the objectives and outcomes of the program, and had no required textbooks.

44. Mr. Jean was the sole instructor for SHH. SHH did not employ sufficient faculty members to enable its class of 40 students to meet program goals.

45. SHH did not have faculty with demonstrated teaching abilities and current knowledge and clinical expertise.

46. There is no evidence SHH faculty performed formative and summative evaluations and clinical practice evaluations of students.

47. The skills/simulation lab at SHH could accommodate five students at a time and was not adequately equipped to allow students to receive instruction and demonstrate all basic nursing skills. SHH did not have a library or computer lab for its students.

48. SHH did not provide faculty-supervised clinical rotations in all five required subject areas of LVN nursing.

49. During the effective period of Governor Abbott's disaster declaration allowing students to exceed the 50 percent limit on clinical education satisfied by simulation exercises, no approved Texas program failed to provide some amount of in-person clinical rotation hours for their students. Students in approved Texas LVN programs performed a minimum of 176 in-person clinical hours in 2020, 96 hours in 2021, and 176 hours in 2022.

## VII. CONCLUSIONS OF LAW

1. The Board has jurisdiction over the licensing and discipline of nurses. Tex. Occ. Code ch. 301.

2. SOAH has jurisdiction over contested cases referred by the Board, including the authority to issue a proposal for decision with findings of fact and conclusions of law. Tex. Occ. Code § 301.459; Tex. Gov't Code ch. 2003.

3.  Respondent received adequate and proper notice of the hearing on the merits. Tex. Occ. Code § 301.454; Tex. Gov't Code §§ 2001.051-.052.

4.  Staff had the burden of proving that disciplinary action against Respondent's license was warranted, and Respondent had the burden of establishing any mitigating evidence. 1 Tex. Admin. Code § 155.427; *Scally v. Tex. St. Bd. of Med. Exam'rs*, 351 S.W.3d 434, 446-48 (Tex. App.—Austin 2011, pet. denied).

5.  To determine whether denial of the Renewal is warranted, Staff had the burden of identifying the legal standards alleged to apply and to produce evidence that they were not met, and Respondent had the ultimate burden of persuasion to show her qualifications for the privilege of continuing nursing practice in this state. Tex. Gov't Code §§ 2001.051-.052; 1 Tex. Admin. Code § 155.427; *Scally*, 351 S.W.3d at 446-48.

6.  The standard of proof is by a preponderance of the evidence. *Granek v. Tex. St. Bd. of Med. Exam'rs*, 172 S.W.3d 761, 777 (Tex. App.—Austin 2005, no pet.); *Sw. Pub. Servs. Co. v. Pub. Util. Comm'n of Tex.*, 962 S.W.2d 207, 213-14 (Tex. App.—Austin 1998, pet. denied).

7.  Based on the foregoing Findings of Fact and Conclusions of Law, Staff did not meet its burden of proof to show that Respondent committed fraud or deceit in procuring or attempting to procure a license or that she used a diploma that was fraudulently purchased, issued, counterfeited, or materially altered. Tex. Occ. Code § 301.452(b)(2), (5).

8.  Disciplinary action is not warranted based on the evidentiary record in this case.

9.  The SHH program was not approved by the Board, accredited by a national nursing accreditation agency the Board determined to have acceptable standards, or approved by the FBON and accepted by the Board. Tex. Occ. Code § 301.157(d).

10. SHH did not meet Board standards for LVN programs with respect to pretesting, curriculum, instructional scope, and teaching aids. 22 Tex. Admin. Code §§ 214.8(d)(4), .9(a), (b)(2), (e), (g)(3), (h), .11(d)(6).

11. SHH did not meet Board standards for LVN program faculty in terms of faculty qualifications, number of instructors, instructor-student ratios, and student evaluations. 22 Tex. Admin. Code §§ 214.7(c), (d)(2)(D), .10(f)-(h).

12. SHH did not meet Board standards for facilities offered by LVN programs with respect to its simulation lab and lack of a library. 22 Tex. Admin. Code § 214.11(b), (d)(5), (e).

13. Even given Governor Abbott's disaster declaration, SHH did not meet Board standards to offer adequate in-person clinical rotations supervised by program faculty. 22 Tex. Admin. Code §§ 214.9(e), .10(c), (g)-(h).

14. Based on the foregoing Findings of Fact and Conclusions of Law, Staff produced evidence to show Respondent did not successfully complete an approved program of vocational nursing, and Respondent did not meet her burden of persuasion to show she was nonetheless qualified. Tex. Occ. Code §§ 301.157(d), .260; 22 Tex. Admin. Code § 217.5(a)(1).

15. Based on the foregoing Findings of Fact and Conclusions of Law, Staff produced evidence to show Respondent did not achieve an education substantially equivalent to Texas standards, and Respondent did not meet her burden of persuasion to show she was nonetheless qualified. Tex. Occ. Code § 301.260; 22 Tex. Admin. Code § 217.5(a)(1)(B).

## VIII. RECOMMENDATION

The Board should uphold Staff's proposed denial of Respondent's Renewal application for her Texas License.

**Signed November 20, 2023.**

ALJ Signature:

Pratibha J. Shendy
Presiding Administrative Law Judge

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 81811442
Filing Code Description: Proposal for Decision
Filing Description: PROPOSAL FOR DECISION
Status as of 11/20/2023 11:48 AM CST

Associated Case Party: TEXAS BOARD OF NURSING

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Vanderford | | john.vanderford@bon.texas.gov | 11/20/2023 11:40:58 AM | SENT |
| Mary Nastasi | | mary.nastasi@bon.texas.gov | 11/20/2023 11:40:58 AM | SENT |
| Mary Nastasi | | mary.nastasi@bon.texas.gov | 11/20/2023 11:40:58 AM | SENT |

Associated Case Party: EDITHOKECHUKWUOMIETIMI

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jenifer Lutton | | jenifer.lutton@wilsonelser.com | 11/20/2023 11:40:58 AM | SENT |
| Lina Al-Salim | | lina.alsalim@wilsonelser.com | 11/20/2023 11:40:58 AM | SENT |
| LINA AL-SALIM | | LINA.ALSALIM@WILSONELSER.COM | 11/20/2023 11:40:58 AM | SENT |

# Appendix C

| | | |
|---|---|---|
| **IN THE MATTER OF PERMANENT** | § | |
| **CERTIFICATE LVN NUMBER 1032052** | § | **BEFORE THE TEXAS** |
| **ISSUED TO EDITH OKECHUKWU** | § | |
| **OMIETIMI,** | § | **BOARD OF NURSING** |
| **RESPONDENT** | § | |

## RESPONDENT'S MOTION FOR REHEARING

**TO THE HONORABLE MEMBERS OF THE TEXAS BOARD OF NURSING:**

**NOW COMES** the Respondent, Edith Okechukwu Omietimi, through her attorney, pursuant to TEX. GOV'T CODE § 2001.145 AND 22 TEX. ADMIN. CODE § 213.16(j), brings this Motion for Rehearing. In support hereof, Movant shows the Board:

### INTRODUCTION

1. In this action, the Texas Board of Nursing (Board) is purporting to deny the renewal of Respondent's license to practice nursing in the State of Texas based on allegations . A contested case hearing was held on September 25th, 2023 before State Office of Administrative Hearings (SOAH) Administrative Law Judge Prabitha J. Shenoy. ALJ Shenoy issued a Proposal for Decision recommending that the Board deny Respondent's renewal application for her Texas license.

2. In the Proposal for Decision, ALJ Shenoy came to the conclusion that the Board failed to show that the Respondent committed fraud or deceit in procuring or attempting to procure a license.[1] ALJ Shenoy concluded that disciplinary action was not warranted based on the evidentiary record in this case. [2]

3. Notwithstanding the fact that disciplinary action was not warranted, ALJ Shenoy found that the Board did produce evidence that allegedly showed the Respondent did not complete an approved program of vocational nursing.[3] ALJ Shenoy also found there was a burden of persuasion that the Respondent was required to meet to show she was

---

[1] Proposal for Decision, at 43, Conclusion of Law No 7.

[2] *Id.*, Conclusion of Law No. 8.

[33] *Id.*, at 44, Conclusion of Law No. 14.

nonetheless qualified.[4] In her recommendation for a sanction, ALJ Shenoy found the Board should deny Respondents renewal of her nursing license.[5] Respondent argues here that Respondent's nursing education was recognized and accepted by the Texas Board of Nursing when they granted her a nursing license in March 2021, renewal of Respondent's nursing license is a ministerial act and does not require the Respondent to meet any burden of persuasion regarding her nursing education, and the effective revocation of Respondent's nursing license violates the due course of law provisions of the Texas Constitution. Therefore, Respondent argues that the Texas Board of Nursing should grant this motion for rehearing, vacate the previous order denying the renewal of Respondent's nursing license, and reconsider disciplinary action consistent with the arguments herein.

### RESPONDENT'S NURSING EDUCATION WAS ACCEPTED BY THE BOARD OF NURSING DURING THE ENDORSEMENT PROCESS UNDER TEXAS OCCUPATIONS CODE § 301.157(d-4)

4.    Conclusions of Law No. Nine (9) asserts that the Sacred Heart program was not approved by the Board, accredited by a national nursing accreditation agency, or approved by the Florida Board of Nursing and accepted by the Board. Respondent does not argue, nor is there evidence that the Sacred Heart program was approved by the Board or that the program was accredited by a national accreditation agency. However, Respondent argues that Sacred Heart was approved by the Florida Board of Nursing (or the Florida Commission for Independent Education, which also approves nursing programs). Under Section 301.157(d) of the Occupations Code, acceptance of an educational credential from a program approved by another state and the Board is subject to subsection d-4. This subsection reads "[t]he board may recognize and accept as approved under this section a school of nursing or educational program operated in another state and approved by a state board of nursing or other regulatory body of that state."[6]

5.    Respondent applied for Texas licensure as a Licensed Vocational Nurse after she obtained a Licensed Practical Nursing license in Florida in January 2021. The Texas

---

[4] *Id.*, at 44, Conclusion of Law No. 14.

[5] *Id.*, at 44.

[6] Tex. Occupations Code § 301.157(d-4).

Board of Nursing granted the Respondent her license on March 22, 2021 with full knowledge that the Respondent had received her educational credentials from Sacred Heart International Institute in Florida. The Board did not object to Respondent's educational credentials at the time of her initial application for licensure, and there is no evidence the Respondent intentionally misrepresented her educational credentials in her license applications.[7]

6.      Respondent notes there is no dispute that the Board accepted her educational credentials from Sacred Heart International Institute from her endorsement application in March 2021. Beyond just showing evidence the Respondent had completed an approved vocational nursing program, Respondent argues this shows that the Board considered that her education was substantially equivalent to Texas standards in March 2021 when the Board granted the Respondent a Licensed Vocational Nursing license. Tex. Occupations Code § 301.157(d), and (d-4). In the alternative, Respondent argues that acceptance of her education acts as a waiver of the alleged deficiencies in the Respondent's educational preparation.

**RENEWAL OF A NURSING LICENSE IS A MINISTERIAL DUTY AND DOES NOT REQUIRE THE RESPONDENT TO MEET ANY BURDEN OF PERSUASION REGARDING HER NURSING EDUCATION**

7.      Conclusions of Law Nos. Five (5), which asserts that Respondent has a "burden of persuasion" to show her qualifications meet a standard for privilege of continuing to practice nursing in Texas, cites an improper standard that does not appear in the cited portions of the Administrative Procedures Act or SOAH rules. The portion of the case cited, *Scally v. Texas State Bd. Of Med. Examiners*, discusses the due process rights due a Respondent in the judicial review process for a disciplinary action for a professional license which is not in question in this matter.[8] Respondent would agree that *Scally* is applicable in this case to the proposition that 1) Respondent's license is a constitutionally protected property interest,[9] and 2) that constitutionally protected property rights at a

---

[7] Proposal for Decision, Finding of Fact No. 33, at 41.

[8] *Scally v. Texas State Bd. Of Med. Examiners,* 351 S.W.3d 434, 446–48 (Tex. App. – Austin, 2011).

[9] *Id.*, at 446.

minimum requires notice and an opportunity to be heard in a meaningful manner.[10] However, what *Scally* does not address the legal standard related to the denial of license renewal, nor does it ever mention that any party has a burden of persuasion.[11] Additionally, Respondent notes that nowhere in the conclusions of law does the Administrative Law Judge address the proper legal standard for denial of a license renewal.

8.    If we are looking for a standard for the renewal of a nursing license, the process is found in Section 301 of the Nursing Practice Act. Specifically, Section 301 states that "A person may renew an unexpired license issued under this chapter on payment to the board of the required renewal fee before the expiration date of the license and compliance with any other renewal requirements adopted by the board."[12] This squarely puts the responsibility for renewing a nursing license on the Respondent but does not specify any additional requirements other than paying a fee and completing other renewal requirements in the Board's rules. The NPA does address some additional requirements, including criminal background checks, Texas Occupations Code § 301.3011(a), and continuing competency, Texas Occupations Code § 301.303–308.

9.    Looking farther into the Board's rules, there is no single rule that addresses license renewal. Board Rule 216.11 asserts that the consequence of failing to comply with the continuing competency requirements contained in Board Rule 216 et. seq. is the denial of license renewal.[13] Failure to pay the indicated fee is also listed as a matter where denial of license renewal is required.[14] There are several instances where the Board may "deny

---

[10] *Id.*, at 447 (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

[11] A search of the *Scally* opinion yields no mention of the term "persuasion" or "renewal". What *Scally* does address is whether a licensee who had their license revoked by a licensing agency can continue to practice pending appeal. Quite clearly that is not the situation in this case as the Nursing Board has not yet taken final action against the Respondent's license.

[12] Texas Occupations Code § 301.301(b).

[13] 22 Texas Administrative Code § 216.11. The process outlined by the Board for a licensee to certify continuing competency for licensure renewal is to sign a statement attesting they have completed the required continuing education. 22 Tex. Admin. Code § 216.8(a)(1). Licensees may be audited by the Board as part of the renewal process. 22 Tex. Admin. Code § 216.9.

[14] 22 Tex. Admin. Code § 216.11.

license renewal",[15] but nowhere in the Board's rules does it indicate the licensees right to due process is in any way affected before a license renewal may occur. Finally, failure to renew a license is covered in Board Rule 217.6, but nowhere in that rule does the Board impose any additional requirements on renew beyond paying the required fee and complying with the continuing competency rule.[16]

10. Nothing in the Board's rules indicates that the Board has the discretion to deny the renewal of a license during the pendency of an investigation that may lead to disciplinary action. There is case law which supports this assertion that renewal of a professional license is a ministerial act on the part of the Board. In *Texas State Board of Medical Examiners v. Mann*, the Texas State Board of Medical Examiners (now called the Texas Medical Board) refused to renew the license to practice medicine of Dr. Nathan Mann.[17] Dr. Mann's license had been revoked in 1958 and was subject to a subsequent lawsuit for judicial review under Article 4506, which allowed for a trial de novo at that time.[18] The lawsuit was dismissed, and the court found the dismissal terminated the Board action, and since Article 4506 at the time called for a de novo trial that meant Dr. Mann's license was uncancelled and unrevoked.[19] And since Dr. Mann's license was thus an active license, "issuance of the (renewal) license by the (Medical) Board was a ministerial duty."[20] As applied in this case, the renewal of a nursing license that is otherwise not revoked or delinquent is a ministerial act by the Board, and a license must be renewed on the payment of the fee and certification of continuing nursing education.[21]

---

[15] The denial of licensure renewal is referenced in the context of fitness to practice, 22 Tex. Admin. Code § 213.29(c), (f)(1); and bars to licensure due to criminal justice issues, 22 Tex. Admin. Code § 213.28(k)(1).

[16] 22 Tex. Admin. Code § 217.6.

[17] *Texas State Bd. Of Med. Examiners v. Mann* 413 S.W.2d 382 (Tex. 1967).

[18] *Id.*, at 382.

[19] *Id.,* at 385.

[20] *Id.*

[21] Tex. Occ. Code § 301.301–308; *Mann*, 413 S.W.2d at 385.

**REVOCATION OF RESPONDENT'S NURSING LICENSE VIOLATES RESPONDENT'S DUE COURSE OF LAW RIGHTS UNDER THE TEXAS CONSTITUTION**

11.     The Texas Constitution guarantees that '[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.[22] A determination if the due course of law provisions of the Texas Constitution attach to any particular situation is a two-step process. The first inquiry is whether the Respondent has a liberty or property interest that is entitled to constitutional "protection.[23] The second is to determine the level of procedural or substantive due process due to protect the asserted liberty or property interest in the particular situation.[24]

12.     As to the first factor, the Texas and United States Supreme Court have long recognized that due-course and due-process clauses can protect work-related economic interests, which have sometimes been characterized as the "right to earn a living,"[25] or the right to engage in a "chosen profession.[26] In Goldberg v. Kelly, an expansive notion of property rights was endorsed by the United States Supreme Court:

> Much of the existing wealth in this country takes the form of rights that do not fall within traditional common-law concepts of property. It has been aptly noted that "[s]ociety today is built around entitlement. The automobile dealer has his franchise, the doctor and lawyer their professional licenses, the worker his union membership, contract, and pension rights, the executive his contract and stock options; all are devices to aid security and independence.[27]

As nursing is such a profession with a professional license, the right to engage in the nursing profession when an individual holds a nursing license clearly implicates the due course of law provisions of the Texas Constitution.

---

[22] Texas Constitution art. I, §19.

[23] *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54,61 (Tex. 2018).

[24] *Mosley v. Texas Health &Human Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019).

[25] *Smith v. Decker*, 312 S.W.2d 632, 633 (Tex. 1958),

[26] *Greene v. McElroy*, 360 U.S. 474, 492 (1959).

[27] *Goldberg v. Kelly*, 397 U.S. 254, 262 n.8 (1970).

13.     Statutes, and the corresponding regulations adopted by an agency pursuant to statutory authority, are presumed constitutional.[28] The party making an as-applied challenge to an professional regulation under the Due Course of Law provision must make a showing under either of the two *Patel* prongs: (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest.[29] Respondent absolutely does not contest that the Board has a rational basis in the regulation and licensing of nursing education programs – arguably that is one of the two major pillars of regulation the Board is charged with enforcing.[30]

14.     In this case, Respondent is asserting the second *Patel* factor, that the actual, real-world effect is oppressively burdensome. In Patel, a group of eyebrow threaders challenged a requirement for certain training in cosmetology that wasn't relevant to their trade.[31] The Texas Supreme Court held that the irrelevant training was not only unreasonable or harsh, but so oppressive that it violates the due course of law protected by the Texas Constitution.[32] In opposition, Respondent notes that in *Garrett v. Texas State Board of Pharmacy*, a recent decision out of the Third Court of Appeals, found that a pair of doctors challenging a ban against dispensing of dangerous drugs without a pharmacist license failed to establish the ban was "so burdensome as to be oppressive" because they were still practicing physicians.[33]

15.     In this matter, Respondent acknowledges that she does already have a license to practice nursing, but that license is the property interest that Respondent seeks to protect. This is unlike the situation in *Garrett*, where the physicians were basically attempting to expand

---

[28] *Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 87 (Tex. 2015).

[29] *Id.*

[30] *See* Texas Occupations Code §301.157 *et. seq*.

[31] *Patel*, 469 S.W.3d at 89.

[32] *Id*., at 90.

[33] *Garrett v. The Tex. State Bd. of Pharm*., 03-21-00039-CV, at *12–14 (Tex.App.–Austin, Jan 25, 2023, no pet.), quoting *Patel*, 469 S.W.3d at 87.

the scope of their medical license, not defend against a state action to revoke that license.[34] Further, Respondent notes that Respondent argues instead this case is more analogous to the situation in *Patel*, where the eyebrow threaders were faced with an unreasonably oppressive training requirement which barred them from entry into the profession. But this isn't the end of the analysis, because the underlying scheme of regulation is not at issue here – Respondent agrees that the regulation of nursing education is rationally related to the statutes and rules at issue.

16. What is missing, however, is a discussion of why the outcome in this case is unreasonably oppressive. And to that argument, we must discuss the actions of the Texas and Florida Boards of Nursing in relation to *Mosley v. Texas Health and Human Services Commission*. In *Mosley*, a nursing assistant was alleged to have abused a patient, and the Health and Human Services Commission (HHSC) proposed placing Mosley on a misconduct registry.[35] After a hearing, Mosley decided to appeal, and filed for judicial review without filing a motion for rehearing, which was a prerequisite for judicial review.[36] Mosley took this action in reliance on the letter accompanying the notice of violation from HHSC which quoted provisions of a repealed rule that did not address the requirement to file a motion for rehearing with the agency.[37] The Texas Supreme Court held that the misrepresentation "effectively deprived Mosely of her right to judicial review and violated her right to due process."[38]

17. While *Mosley* directly addresses due process that is procedural in nature, the actions of the Board and the Florida Board of Nursing are analogous under a due course of law framework. While both agencies did not expressly mislead the Respondent, both agencies accepted the educational credentials from the Respondent, and the Florida Board of Nursing and Florida Commission for Independent Education still considered the Sacred

---

[34] *Garrett*, 03-21-00039-CV, at *13.

[35] *Mosley v. Tex. Health & Human Servs. Comm'n*, 593 S.W.3d 250, 255 (Tex. 2019).

[36] *Id.*, at 256.

[37] *Id.*

[38] *Id.*, at 263.

Heart program to be an approved program at the time Respondent presented her credentials. As in *Mosley*, Respondent relied on the representations embodied in the granting of her nursing license to bolster her good faith belief her educational credentials were granted lawfully and supported her claim to renewal of her nursing license. Thus, the Board's actions to deny the renewal of Respondent's license, essentially revoking her license, violate the Respondent's right to due process under the Texas Constitutions due course of law provisions.

### BASED ON THE FOREGOING ARGUMENTS, THERE SHOULD BE NO DISCIPLINARY ACTION TAKEN AGAINST THE RESPONDENT

18.    Respondent notes that the Administrative Law Judge found there was no intentional misrepresentations made by the Respondent in her licensure by endorsement application filed in March 2021, and thus no violations of Tex. Occ. Code § 301.452(b)(2) or (5).[39] Further, Respondent argues above that the Board waived any complaints related to her nursing education when she was granted her license as a licensed vocational nurse. Because the Respondent was licensed, she has a property right that has vested in that licensed vocational nursing license.[40] This does not mean the Board has no authority to take action against a licensee, but based on the foregoing arguments, authority for the Board to take action is limited to disciplinary actions under 301.452(b), or a failure to meet renewal requirements which would not trigger a ministerial act of licensure renewal by the Board.[41] Finally, Respondent argues that under the due course of law provisions of the Texas Constitution, the Board has violated Respondents substantive due process rights to continued licensure as a nurse. As there is no disciplinary action which to attach a sanction, nor any evidence the Respondent failed to meet her renewal requirement, no action should be taken against Respondent's license to practice nursing in Texas.

---

[39] Proposal for Decision, at 30–31.

[40] Goldberg, 297 U.S. at 262 n.8.

[41] *Mann*, 413 S.W.2d at 385.

19.    Respondent, Edith Okechukwu Omietimi prays that the Board of Nursing:

a.    Grant this motion for rehearing and take the following actions;

b.    Replace Conclusions of Law Nos. Five (5), and Nine (9) with the following conclusions of law:

i.    Renewal of a nursing license is a ministerial duty upon payment the required fee, complying with a criminal background check if required, and complying with the continuing competency requirements required by the Board. Tex. Occ. Code § 301.301–308; *Tex. St. Brd. of Med. Exam'rs v. Mann*, 413 S.W.2d 382, 385 (Tex. 1967).

ii.    The Board recognized and accepted as approved the Sacred Heart International Institute educational program Respondent graduated from as acceptable for licensure in March, 2021 when the Board granted the Respondent a Licensed Vocational Nursing license. Tex. Occupations Code § 301.157(d), and (d-4).

c.    Delete Conclusions of Law Nos. Fourteen (14) and Fifteen (15).

d.    Take no action against the Respondent's license to practice as a licensed vocational nurse.

Respectfully submitted,

Law Office of Marc Meyer, PLLC
2300 Woodforest Pkwy N, STE 600
Montgomery, TX 77316

*Marc M. Meyer*

Marc M. Meyer
State Bar No. 24070266
Attorney for: Respondent Edith Okechukwu Omietimi
Phone: (281) 259-7575
Fax: (866) 839-6920
Email: marc@marcmeyerlawfirm.com

## CERTIFICATE OF SERVICE

This is to certify that on the 13th day of May, 2024, a true and correct copy of the above and foregoing document was served on the following individual(s) at the location(s) and in the manner indicated below:

John Vanderford, Deputy General Counsel
Texas Board of Nursing
1801 Congress Ave, STE 10-200
Austin, TX 78701
VIA email at john.vanderford@bon.texas.gov,
By fax at (512) 305-8101, and via the state efiling portal


_Marc M. Meyer_
Marc M. Meyer

# Appendix D

## CAUSE NO. D-1-GN-24-003659

| | | |
|---|---|---|
| **EDITH OMIETIMI,**<br>*Plaintiff,* | §<br>§<br>§ | **IN THE DISTRICT COURT OF** |
| **v.** | §<br>§<br>§ | **TRAVIS COUNTY, TEXAS** |
| **TEXAS BOARD OF NURSING,**<br>*Defendant.* | §<br>§<br>§<br>§ | **419TH JUDICIAL DISTRICT** |

## <u>FINAL JUDGMENT</u>

The captioned suit for judicial review came before the Court for trial on December 19, 2024. Plaintiff, Edith Omietimi, was present through counsel, Marc Meyer. Defendant, Texas Board of Nursing, was present through its counsel, Assistant Attorney General Kathy Johnson, Office of the Attorney General.

Having reviewed and considered the redacted administrative record, the evidence admitted at trial, the parties' briefs, and the other relevant material on record, and having heard the arguments of counsel, the Court determines that the Defendant Texas Board of Nursing's Final Order dated April 18, 2024 (Final Order) is supported by substantial evidence. The Court also finds that the Final Order is NOT: 1) in violation of a constitutional or statutory provision; 2) in excess of statutory authority; 3) made through unlawful procedure; 4) affected by other error of law; 5) arbitrary or capricious; or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

1. The Final Order is in all respects AFFIRMED;

3. All parties bear their own costs; and

4. All relief not expressly granted herein is DENIED.

This is a final judgment and disposes of all claims of all parties.

IT IS SO ORDERED, ADJUDGED AND DECREED on

_February 19_____, 2025.


_____
THE HONORABLE MAYA GUERRA GAMBLE
Judge of the 459th Judicial District Court
Travis County, Texas


Cause No. D-1-GN-24-003659, Final Judgment

2

February 14

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Christian Young on behalf of Kathy Johnson
Bar No. 24126964
christian.young@oag.texas.gov
Envelope ID: 104943253
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Appellee BON's Brief on the Merits
Status as of 8/28/2025 6:54 AM CST

Associated Case Party: EdithOkechukwuOmietimi

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Marc Meyer | | marc@marcmeyerlawfirm.com | 8/27/2025 6:38:03 PM | SENT |
| Sandra Thornton | | sandra@marcmeyerlawfirm.com | 8/27/2025 6:38:03 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John Vanderford | 24086670 | jvanderford@gmail.com | 8/27/2025 6:38:03 PM | SENT |
| Katherine Johnson | 24126964 | kathy.johnson@oag.texas.gov | 8/27/2025 6:38:03 PM | SENT |

Associated Case Party: Texas Board of Nursing

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christian Young | | christian.young@oag.texas.gov | 8/27/2025 6:38:03 PM | SENT |
| Kathy Johnson | | Kathy.Johnson@oag.texas.gov | 8/27/2025 6:38:03 PM | SENT |